1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


------------------------------X

UNITED STATES OF AMERICA,         :
                                        CR-13-00072
        -against-                 :
                                    United States Courthouse
MARCOS ALONZO ZEA,                : Central Islip, New York

            Defendant.            : April 20, 2015
                                    10:30 a.m.
------------------------------X


                 TRANSCRIPT OF SENTENCING
          BEFORE THE HONORABLE SANDRA J. FEUERSTEIN
             UNITED STATES DISTRICT COURT JUDGE



APPEARANCES:

For the Government:        LORETTA E. LYNCH, ESQ.
                           UNITED STATES ATTORNEY
                           610 Federal Plaza
                           Central Islip, New York 11722
                           BY:  JOHN J. DURHAM, ESQ.
                                SETH DuCHARME, ESQ.



For the Defendant:         MARK BOGATIN, ESQ.
                           277 Broadway, Suite 900
                           New York, New York 10007




Official Court Reporter:   Ellen S. Combs, CSR
                           100 Federal Plaza - Suite 1180
                           Central Islip, New York 11722
                           Phone (631) 712-6107
                           Fax (631) 712-6123


           Proceedings recorded by mechanical stenography
                Transcript produced by Computer

2

1        THE CLERK:  13-CR-72, United States vs Marcos

2   Zea.

3        State your appearances.

4        MR. DURHAM:  John Durham and Seth DuCharme for

5   the United States.

6        Good morning, your Honor.

7        THE COURT:  Good morning.

8        MR. BOGATIN:  For the defendant, Mark Bogatin.

9        Good morning, your Honor.

10       THE COURT:  Please be seated.

11       Be assured I have read all of the submissions

12  that have been made in this case.

13       MR. BOGATIN:  Your Honor, can I just ask; did

14  the Court read the late filing last Thursday by ECF, my

15  reply memo?

16       THE COURT:  I have read everything.

17       MR. BOGATIN:  Okay, good.

18       THE COURT:  That being said, I understand,

19  correct me if I'm wrong, that you are in agreement about

20  the presentence report with the exception of one issue.

21       Am I correct?

22       MR. BOGATIN:  Yes, your Honor.  That is fair and

23  correct.

24       THE COURT:  The government approves the

25  probation report?

3

1      MR. DURHAM:  We do, your Honor.

2      THE COURT:  Would you like to state your one

3  objection on the record.

4      MR. BOGATIN:  Yes, your Honor.

5      The defendant objects --

6      THE COURT:  Excuse me for just a minute.

7      (There was a pause in the proceedings.)

8      THE COURT:  You may be seated if you wish, if

9  it's more comfortable for you.

10      Okay, that being said, aside from it's fine with

11  me if you sit down, I would also like you to know that if

12  we can't hear you I'll ask you to sit down.  So you may

13  stand or be seated.  But if it brings you closer to the

14  microphone and you need that, then I'll ask you to sit.

15      MR. BOGATIN:  I'm perfectly happy, your Honor.

16      THE COURT:  That is fine.

17      MR. BOGATIN:  With regard to the guidelines

18  calculation; the defendant believes that the terrorism

19  enhancement which moves the defendant to a Level 12 does

20  not and should not apply on the facts.

21      We believe that there is no evidence in this

22  case to satisfy the standard articulated in the case law

23  that we have set forth in our sentencing memorandum.

24      The Second Circuit states in United States vs

25  Stewart --

4

1        THE COURT:  I read all of that, yes.

2        MR. BOGATIN:  And under the cases it is not

3   enough to show that the defendant somehow aided some

4   organization which may satisfy the requirement for the

5   enhancement.  The evidence showed  that the defendant

6   himself, specifically had to commit this crime of

7   terrorism to retaliate against the government, to

8   influence government conduct.

9        I think the case of Stewart, USA vs Stewart is

10  very close to our case, very close to our case.  And in

11  that case the Second Circuit affirmed denial of the

12  enhancement to us and or to Yousry who was the translator

13  who helped the attorney named Stewart in her efforts to

14  aid the client's sheikh, which obviously was an error, and

15  to influence government conduct.  And the translator --

16        THE COURT:  So you're putting the attorney Lynne

17  Stuart in the same position as your client?

18        MR. BOGATIN:  No, no.  The translator, the

19  translator was the one that the judge, the District Court

20  judge said the enhancement does not apply.  The Second

21  Circuit said we affirm the enhancement does not apply.

22  The evidence did not show that the translator's conduct --

23        THE COURT:  Did the translator, Mr. Bogatin,

24  give funds and other support to a terrorist organization?

25        MR. BOGATIN:  Aided by a sheikh and he aided

5

1   Ms. Stuart in their efforts to communicate to the violent

2   jihad group in Egypt they should end the cease-fire and

3   launch jihad.

4            THE COURT:  I'll ask you to sit down.

5            Did the translator give financial or other

6   actual support to a named terrorist organization.

7            MR. BOGATIN:  No, your Honor, no.  The answer to

8   that is, no.

9            And we believe though, that the evidence in that

10  case of course, the evidence shows the intent of the

11  defendant being sentenced to a fact to influence

12  government conduct.  There is none of that evidence in

13  this case.

14           THE COURT:  Let me ask you this.

15           You agree that the organizations named, are

16  named, they're terrorist organizations.  Do you agree?

17           MR. BOGATIN:  Yes, correct, of course, yes.

18           THE COURT:  And you agree that your client gave

19  financial support to those organizations and offered, was

20  offering both himself and other people aiding other people

21  to aid those organizations?

22           MR. BOGATIN:  Yes.  We agree that the defendant

23  offered himself to travel to AQAP to join the group.  That

24  is the plea.

25           THE COURT:  And why was he doing that, if not

6

```
1    for support, to support those organizations?
2              MR. BOGATIN:  There is no evidence in the record
3    from -- there was a lengthy investigation we had with
4    tapes of many, many hours and hours of tapes.  The
5    government has pointed to, they pointed to evidence of the
6    codefendant --
7              THE COURT:  I know, and I read all of your
8    papers.  But my question is, Then why was he going there?
9              MR. BOGATIN:  There are many different reasons
10   why somebody could --
11             THE COURT:  Well give me one.  Did he want to
12   see the desert, or what was it?
13             MR. BOGATIN:  No.  He had planned and he
14   allocuted his intent was to join a AQAP.  But you can join
15   that organization and go there without intending to do
16   certain things.  And the government --
17             THE COURT:  Such as what?  Really, I'm asking
18   you, what?
19             MR. BOGATIN:  There is no evidence that he was
20   going to wage war against the Yemen government or whether
21   he was going to wage war against the US government.  No
22   evidence he intended to do any of that.  There is no
23   evidence that this individual, this man had that intent.
24   The government has the burden in this proceeding to point
25   to evidence in the investigation, the one year two year
```

7

1  investigation, for which they can point to the Court that

2  this was his intent.  That it was to fight a government,

3  fight that government or fight our government.  There is

4  no evidence in this proceeding in which the Court, we

5  submit, the Court can make a finding that he intended to

6  fight any government.

7          THE COURT:  Okay, I thank you.

8          And I will ask the government, because I think

9  they have much to say on this, much of which was included

10  in their last letter.

11          MR. DURHAM:  That's correct, your Honor.

12          And the Court heard, and the jury asked

13  questions of what was this defendant's intent when he

14  attempted to travel?  What was his intent when he provided

15  assistance, both financial support as well as providing

16  encouragement to co-conspirators who were going to travel,

17  who expressed the intent to commit murder and violent

18  operations while he was over there.

19          Here this isn't even remotely a close question,

20  your Honor.  There is no dispute that AQAP is a terrorist

21  organization.  This defendant allocuted that he intended

22  to join this organization.  And this organization had no

23  other purpose other than to attempt to influence

24  government conduct with intimidation, and terrorist acts

25  in retaliation of governments such as the United States,

8

1   such as the Yemen government, such as our other western

2   allies who take positions and views that are contrary to

3   al-Qaeda's views of the world.

4           I think there is also a dispute when the Court

5   looks at different incidents that AQAP has been involved

6   in.  We cited a number of instances.  An instance involved

7   a plane on Christmas day 2009.  And in October of 2010

8   they attempted to send explosives through cargo packages.

9           That is during a period of time when this

10  defendant converted to Islam and he became radicalized.

11  He was reading Inspire magazines.  All of these things

12  were the subject of those magazines, and all of that was

13  this defendant's intent in terms of what he was planning

14  to do when he traveled to Yemen.

15          Moreover, judge, there is evidence in the

16  record -- maybe not in the record in which this defendant

17  pled, but in the discovery we provided to counsel -- there

18  are recordings in which the defendant discusses his views

19  about Yemen about Sharia laws.

20          One of the central focuses of the violence that

21  is brought on by Yemen is AQAP and their allies fighting

22  with the enemy governments.  The secular Yemeni government

23  imposes the imposition of Sharia law.  There are extensive

24  discussions in the recordings we provided.  There are

25  conversations where the undercover was present in which

1    this defendant expressed his views about AQAP, about

2    Sharia law, about fighting with the Yemeni government.

3           There also have been cases on the trial,

4    including testimony of multiple witnesses.  There was no

5    doubt what this defendant's intent was when he traveled.

6           The Court doesn't even need to reach all that.

7    Given the fact that this defendant allocuted he was going

8    to join AQAP is squarely within the law, bolstered by

9    Section 3A1.4 of the guidelines as well as 2332 Section

10   (b)(g)(5) in the code that defines what the federal crime

11   of terrorism is, and that the defendant's conduct is

12   squarely within that conduct.

13           THE COURT:  Anything else?

14           MR. BOGATIN:  Your Honor, I disagree slightly

15   with my brethren over here in terms of what the tapes

16   show.  And I agree that the Court doesn't have to go to

17   the tapes at this point.

18           But I have viewed the tapes just as opposing

19   counsel has.  And there is nothing in the tapes comparable

20   or anywhere near the level of specific intent that the

21   codefendant exhibited, that the defendant -- that the

22   government concluded in their papers.

23           Thank you.

24           THE COURT:  Well, I think the government's April

25   14th letter clearly lays out enough to meet the specific

10

1   intent that is necessary.

2          And frankly I think it is somewhat disingenuous

3   to state that someone who supports, apparently in every

4   was, a particular group that has a particular purpose, is

5   not interested in furthering those goals and does not have

6   an intent to do so.

7          Anything further?

8          MR. BOGATIN:  Not on that point, your Honor.

9          THE COURT:  Anything else then?

10         MR. BOGATIN:  On the sentencing?  Yes, yes your

11  Honor.

12         THE COURT:  No, as far as --

13         MR. BOGATIN:  Nothing on the PSI, nothing else

14  on the guideline issue.

15         Well I'm sorry, I misspoke.

16         There is that letter I wrote with the factual

17  issues, and the government believes that are not material

18  and I join in that.  But that's in the papers.

19         THE COURT:  You join in that?

20         MR. BOGATIN:  I join in their position that

21  items that we disputed are not material, and we ask the

22  Court not to consider them.

23         THE COURT:  And therefore there will not be a

24  Fatico Hearing on those issues.

25         MR. BOGATIN:  Yes.

11

1          THE COURT:  Understood.

2          So, let me state clearly that I believe, having

3     read everything, that the terrorism enhancement applies

4     here.  And therefore, the probation report is accepted in

5     its entirety.

6          Now on the issue -- does the government have any

7     objections?

8          MR. DURHAM:  No, your Honor.

9          THE COURT:  Now, is there anything you wish to

10    say in addition to what you have submitted which is all

11    part of the record, on behalf of your client prior to

12    sentencing?

13         MR. BOGATIN:  Yes, your Honor.

14         The defendant is 26 years old.  And he was

15    charged and has been convicted of a very serious offense.

16    He has a large number -- he comes from a large family, all

17    of whom, or many of them are here today.

18         THE COURT:  And who have written letters.

19         MR. BOGATIN:  Have written letters.  And I know

20    the Court has considered and read them.

21         And your Honor, just a point I would like to

22    stress is that the guidelines as calculated in the PSR and

23    recommended sentence by the government, 25 years is the

24    maximum under the plea agreement if it is accepted by the

25    Court, would be --

12

1          THE COURT:  And that was an agreement signed by

2     your client.

3          MR. BOGATIN:  Yes.  It is the maximum.  Which

4     means --

5          THE COURT:  So you're seeking a sentence beneath

6     the 300, the 300 month agreed upon maximum, correct?

7          MR. BOGATIN:  Yes, maximum, yes, we are, yes.

8          And your Honor, if you look at, I know your

9     Honor has looked at it, we have conducted a review of

10    sentences in comparable cases, federal.

11         THE COURT:  Yes.  But let me just say about

12    that, to make it clear.

13         You are actually relying upon, just so it's

14    clear for the record, although it is here from your

15    submissions, that you are relying upon press releases from

16    the Department of Justice.  That is the entirety of your

17    submissions on this issue.  Am I correct?

18         MR. BOGATIN:  Not the entirety.  We also cite

19    some cases and we cited the District Court decision in

20    United States vs Warsame, where a judge was faced with a

21    defendant convicted of the same crime, the same offense as

22    this defendant.  That District Court judge conducted a

23    review of sentences handed down from the courts, the

24    federal courts for other cases.  He looked at a number of

25    cases.  And that judge -- in that case you have a

13

1   defendant whose conduct was much more culpable than

2   Mr. Zea.

3            THE COURT:  Did you read the probation report

4   Mr. Bogatin?

5            MR. BOGATIN:  I did not read the probation

6   report.  I certainly read the probation report's decision.

7            But in terms of the press releases, I think CNN

8   or Fox News --

9            THE COURT:  -- you went to the Department of

10  Justice.

11           MR. BOGATIN:  -- the Department of Justice.  And

12  these are, I submit is an extremely reliable choice.

13           THE COURT:  You may submit that.  .

14           MR. BOGATIN:  And these are cases --

15           THE COURT:  They're press releases.  They are

16  not the entirety of the submissions that were considered

17  by the judge, certainly you will agree.

18           MR. BOGATIN:  That is correct.  That's what I

19  said.

20           I haven't heard anything from the government

21  saying this is not representative because of this, or not

22  representative of that, because --

23           THE COURT:  I don't think -- well I'm certainly

24  not going to think that.  They may be representative of a

25  superficial examination.  But certainly they are not

14

1   representative of an in depth examination of each

2   defendant's 3553 factors, or cooperation agreements, or

3   plea agreements, or things of that nature.

4           MR. BOGATIN:  Your Honor, there are defendants

5   who cooperated whether it is cases where someone

6   cooperated, I left those cases out.  Obviously cooperating

7   cases are not this case.

8           But if you look at those cases, people that get

9   25 years are usually people who went to trial, or people

10  who have conspired to commit much more horrific acts, or

11  horrific acts, which are not present in this case.

12          In the sense, if you look at people who get a 25

13  years sentence, you have people who are convicted at

14  trial, his hostages taken.  You have people who have

15  conspired to blow up public buildings, monuments; people

16  who have made attempts on the life of a president.

17          And one of the most interesting defendants is

18  Victor Bauer who has drugs -- not drugs, arms trafficking.

19  He was convicted at trial of providing millions of

20  dollars worth --

21          THE COURT:  And your client didn't have --

22          MR. BOGATIN:  What?

23          THE COURT:  I'm assuming you're client didn't

24  have access to millions.  But go ahead.

25          MR. DURHAM:  And he wasn't convicted after

15

1   trial.  So I think --

2           THE COURT:  What do you think would be fair,

3   Mr. Bogatin?

4           MR. BOGATIN:  I think, I think a ten year

5   sentence would not be, would be proportionate, would be in

6   line with the cases that, of other defendants who have

7   been convicted based on comparable conduct.  We have a man

8   who never --

9           THE COURT:  Was convicted.

10          MR. BOGATIN:  No, never set foot, he never, met

11  with terrorists, he never spoke with terrorist, he never

12  -- any type of terrorist acts.  He never made it to Yemen.

13          THE COURT:  That was fortuitous.

14          MR. BOGATIN:  It was fortuitous, there is no

15  question about that.

16          But there is a truly a distinction in criminal

17  law between people who commit an offense and people who

18  attempt to commit it.  Whether it was fortuitous or not,

19  there's still a different level of culpability.  And it's

20  reflected in sentences.

21          I think it's hard to find anybody in his

22  situation with a 20 year sentence, or even a 15 year

23  sentence.  Certainly nobody got a 20 year sentence,

24  somebody who tried, whose conduct was to get on a plane

25  and attempt to travel, was not successful, and came back.

**16**

1    You know, somebody who did not himself, did not inflict

2    any injury, never plotted any injury.  He never conspired

3    to commit any injury.

4            And I just think that you should consider -- a

5    25 years sentence would make this case an outlier for the

6    range of federal terrorism cases across the nation.  This

7    would be factually disproportionate.  And with the Osama

8    case of people who actually met with Osama bin Laden, who

9    worked for al-Qaeda in that country, who received

10   training.  And federal judge in that case looked at all

11   the other comparable cases.  And he looked at the case of

12   a Hamdan, and he was given a sentence of five years.  And

13   the case of the Lackawana Six, which was a Federal Court

14   case.

15           THE COURT:  I'm aware of that.

16           MR. BOGATIN:  And they received sentences, I

17   believe, of five and-a-half to ten years.

18           I had think that 25 years for this man, based on

19   what he actually did would be vastly disproportionate.

20   And I think the argument in this case is, the guideline

21   sentence which is 25 years according to the plea

22   agreement, the guideline sentence of 25 years would be

23   disproportionate to the defendant's conduct, what he

24   actually did and would render his sentence

25   disproportionate.

17

1          THE COURT:  Actually the guidelines, when we

2     begin were actually higher, right?

3          MR. BOGATIN:  The guidelines were life.

4          THE COURT:  Thirty to life.

5          MR. BOGATIN:  Yes, were 30 to -- well the

6     guideline --

7          THE COURT:  I just want the record to be clear,

8     right.

9          MR. BOGATIN:  Yes, it's in the report.  We have

10    a plea agreement.

11         THE COURT:  Correct.

12         MR. BOGATIN:  And effectively, your Honor, what

13    I'm suggesting is that the guidelines purpose is to avoid

14    disparity.

15         THE COURT:  At the beginning, yes.  That is the

16    purpose of the guidelines, and it is a beginning.

17         MR. BOGATIN:  And I think that the purpose in

18    this case is still served by looking at the guideline

19    sentence.  Because if you look at cases around the nation

20    in Federal Court, people in his situation who never

21    committed a violent act, never met, or never set foot over

22    there, don't get 25 years.  I think it would be, in every

23    sense of the word an unfair sentence and a

24    disproportionate sentence.

25         THE COURT:  He served how much time?

1          MR. BOGATIN:  I think it's one and-a-half years,

2   18 months, so one and-a-half years.

3          THE COURT:  All right.  Thank you.

4          MR. BOGATIN:  Thank you, your Honor.

5          THE COURT:  Government wish to respond?

6          MR. DURHAM:  Briefly, your Honor.

7          In the instant matter the Court has already

8   found we agree with the guidelines calculation in the

9   presentence report.  That would mean 360 months to life.

10          I think in the count of conviction in effect the

11   guideline range was applied.  The government has already

12   shown this defendant agreed to a 25 year cap.  We agreed

13   upon a 25 year sentence which is below the viable

14   guideline range.  So we have already shown leniency to

15   this defendant.

16          I don't want the Court to mistake our leniency

17   with weakness.  There is overwhelming evidence of this

18   defendant's guilt.  I know the Court has read our

19   sentencing memo, so I'm not going to repeat everything we

20   said in there.  But I do want highlight a couple of things

21   for the Court.

22          When the Court considers the factors specified

23   under 3553(a), this is extremely serious conduct.

24   Mr. Bogatin's sentence memo acknowledges that it's

25   serious.

**19**

1           THE COURT:  Also in open court this morning.

2           MR. DURHAM:  He has focused on this defendant's

3   attempts to provide support to AQAP.  Out of that count of

4   conviction there is also obstruction of justice, which I

5   think is not present in many of those cases that he cited

6   and also makes this a more serious offense.

7           I think this defendant's characteristics are

8   also important factors.  And while he has no criminal

9   history, he was born and raised in the United States.  He

10  went to school in Brentwood.  He has family who are here

11  today.  There are letters.  They appear to be supportive.

12  They appear to be decent hard-working people.  But despite

13  all of that, and despite a good family, despite being born

14  and raised here, working here, he elected to betray the

15  government and join al-Qaeda; an organization that is

16  sworn to the destruction of this country.

17          This is extremely serious conduct.  And in

18  particular I want the Court to think about deterrence.

19          THE COURT:  And taking responsibility for

20  horrific acts of violence.

21          MR. DURHAM:  That's correct, your Honor, taking

22  responsibility, and frankly plotted many other horrific

23  acts which have been disrupted.

24          But in terms of deterrence, we ask the Court to

25  consider both general deterrence and specific deterrence.

20

1        When I say, general deterrence, in response to

2   the threat the US Government has made it increasingly

3   difficult for foreigners to come to the United States.

4   And al-Qaeda, and other groups have responded to that.

5   And what they've done is they have tried to recruit

6   homegrown terrorists, and have done so thorough, and in

7   such a magnitude on the Internet.  And when this defendant

8   was arrested --

9        THE COURT:  Wasn't he featured in an article

10   here?

11        MR. DURHAM:  Following his arrest, your Honor,

12   the spring of 2014 issued of Inspire actually included a

13   photograph of the defendant and a note about his arrest.

14        And the hard drive of his computer showed that

15   he had been reading the Inspire magazine before he

16   attempted travel to Yemen.

17        But the risk here obviously is great.  A US

18   citizen can travel overseas and return to the United

19   States and move about within the United States and has

20   specific knowledge of things here.  And as we have stated

21   in our memo, this isn't just a hypothetical concern.

22        There are a litany of examples of people who

23   have traveled overseas and have returned and done

24   terrorist acts.  We tried the case of Vinas.  He was

25   another Long Islander.  He traveled to Pakistan.  He

21

1    joined al-Qaeda.  He received training.  He participated

2    in rocket attacks against US troops over there.

3            He also provided information about the Long

4    Island Rail Road, and provided that to al-Qaeda and

5    plotted attacks.  That is an example of why this is a

6    serious offense.

7            The Court doesn't have to look much further than

8    the Boston bomber.  That's somebody who lived here,

9    traveled overseas, was further radicalized, returned and

10   committed terror attacks our soil.

11           Al-Qaeda's, to be specific, recent attacks in

12   Charlie Hebdo.  People living in France traveling to

13   Yemen, specifically to Yemen, received training, went back

14   to Paris and carried out atrocities, slaughtering people.

15           That is the face of terrorism, in this country.

16   It is shifting.  They're recruiting homegrown people to

17   commit acts of terrorism on our soil.  That is why this

18   case is important.

19           But this defendant did not get to travel.  He

20   attempted to join al-Qaeda.  He also encouraged his

21   codefendant who was younger.  This defendant had converted

22   before Mr. Kaliebe.  He was older than him.  He not only

23   provided encouragement for Mr. Kaliebe, he provided

24   financial assistance to help him.

25           THE COURT:  Anything further?

1           MR. DURHAM:  Just a couple of things, your

2    Honor.

3           With respect to specific deterrence, this

4    defendant has had numerous interactions with law

5    enforcement.  Yet none of these deterred him from

6    continuing to try to provide assistance to terrorist

7    organizations.  He attempted to travel.  Took every step

8    to get to Yemen.  He just turned back when he faced the

9    authorities.

10          When he returned to the United States he was

11   interviewed by customs and border patrol.  He lied to

12   them.  He took another trip.  And when he returned he was

13   interviewed by the FBI.  He lied to them.  Knowing that he

14   was under investigation he then attempted to obstruct the

15   investigation by destroying things.  Numerous attempts,

16   numerous contacts with law enforcement where he could have

17   chosen to give up his terrorist acts.  He didn't, he

18   continued.

19          For all of those reasons, deterrence as well as

20   to protect the public from further crimes from this

21   defendant, we're asking Court to sentence him to the

22   maximum.

23          MR. BOGATIN:  Just your Honor, can I be heard?

24          Your Honor, opposing counsel talks about the

25   Boston marathon bomber.  Clearly those cases are in a

23

1    class by themselves.  There is nothing in the record.

2          THE COURT:  Counsel, it is interesting you say

3    that.  Everything, every crime, every defendant is in a

4    class by themselves, truly.

5          MR. BOGATIN:  Yes, your Honor.

6          THE COURT:  Go ahead.

7          MR. BOGATIN:  I want to address your Honor's

8    comment.  A certain Second Circuit judge wants, and when

9    my colleague says that this is an ordinary criminal case.

10   And a Second Circuit judge says there is no such thing as

11   an ordinary criminal case.

12         I'm sorry.

13         The 25 year sentence, life sentence is something

14   that would apply to a case where people were killed and

15   they got a 25 year to life sentence.  There is nothing

16   that shows that Mr. Zea and the evidence to the

17   investigation that shows any type of conduct or any type

18   of plan, any type of plotted intended conduct on the part

19   of Mr. Zea.  And which is, which is in that class, in that

20   category.

21         And with regard to, to emphasize the fact that

22   Mr. Zea has taken responsibility.  He has pled.  He pled

23   guilty at a very early stage in this proceeding.  There

24   were no motions.  There was no hearing that the government

25   had to bring out anything or submit material, or anything

24

1    like that.  And the defendant has pled guilty and hasn't

2    denied his responsibility.

3            In this case, the obstruction, counsel addressed

4    the question of obstruction.  There are a number of people

5    in the case.  I have submitted in the material to the

6    Court that on obstruction.  And they did not receive 25

7    years sentences.

8            Thank you, your Honor.

9            THE COURT:  If you are referring to the burning

10    of the, the efforts to burn or otherwise destroy the

11    documentation on his computer?  The obstruction --

12            MR. BOGATIN:  That is the obstruction, yes, that

13    he gave it to a friend and asked the friend to empty out

14    the hard drive.

15            And your Honor, in furtherance of obstruction he

16    certainly didn't do it.  I would venture that there are

17    certainly different levels of obstruction; telling a

18    witness to change his story or not to testify is --

19            THE COURT:  Well, yes.

20            MR. BOGATIN:  I submit somebody asking a

21    defendant to get their hard drive with no subpoena,

22    nothing outstanding, that could not be a crime.  I

23    understand it is a crime today.  But I just would submit

24    that I'm sure that many people would be surprised to learn

25    that it is a crime that you have a hard drive and no

1   subpoena.

2          THE COURT:  We're not talk about other people

3   this morning.  We're speaking of your client who destroyed

4   or sought to have others destroy information indicative of

5   a crime, our crimes under subpoena.

6          All right?

7          MR. BOGATIN:  Yes.

8          THE COURT:  All right, you have had a reply.

9          Does the government have anything to add?

10         MR. DURHAM:  No, your Honor.

11         THE COURT:  Does your client wish to say

12  anything prior to the imposition of sentence?

13         THE DEFENDANT:  No, your Honor.

14         THE COURT:  That being said, the sentence will

15  be as follows.  And understand that I have taken into

16  account all of the 3553 factors and the fact that he

17  doesn't have any prior convictions, of course.

18         But I am particularly focused right now on both

19  personal deterrence, which I think the government has

20  properly laid out as an issue in this case.  Because

21  despite efforts by others to dissuade the defendant and in

22  fact actually roadblocks that were placed in his path, he

23  continued to pursue efforts to further along, if not his

24  own ability to join these groups, then to help others do

25  so.

1          So, I think there is a definite need for

2     consideration of personal deterrence here.  I also think

3     that there is a need for general deterrence here because

4     this is, as you have said, a most serious crime.  And I

5     think that there has to be a message sent to others that

6     this is absolutely not acceptable behavior.  I think that

7     message has to be sent, sadly in light of the times in

8     which we are living.

9          As you already indicated the nature and

10    circumstances of the offense conduct are very serious.

11    And I also think there is a need to always protect the

12    public.

13         So taking all of those things into account, and

14    of course the Probation Department, the sentence will be

15    as follows:

16         On Count Three, 180 months of incarceration with

17    three years of supervised release.

18         On Count Four, 120 months of incarceration,

19    consecutive to Count Three, with three years of supervised

20    release.

21         Totalling the 300 months that was the maximum

22    agreed upon in the plea agreement.

23         Special conditions of supervised release.  As to

24    those conditions they will include the following.

25         For a period of six months the defendant will

27

1   comply with a curfew via electronic monitoring directed by

2   the United States Probation Department and will remain at

3   his place of residence from seven p.m. to seven a.m.  And

4   the probation department may as well designate another

5   twelve hour time period if the defendant's employment,

6   education and/or observance of religious services in any

7   way precludes the above specified time.

8        The curfew shall commence on a date approved by

9   the probation department.  And the defendant shall wear an

10  electronic monitoring bracelet or a similar tracking

11  device, and follow all requirements and procedures

12  established for that curfew by the probation department,

13  and shall pay any costs associated with it to the extent

14  to which he is able.  And because of that he will have to

15  submit all of his financial information to the probation

16  department so that they can properly assess his ability to

17  pay for that monitoring.

18       He shall not associate in person or through any

19  type of mail, electronic mail, or telephone, or any other

20  means of communication that may be available at the time

21  that he is actually under supervised release.  Because I

22  know that there may be methods of communication after that

23  lengthy period to which he is being sentenced for

24  incarceration, that we can not envision today; so in any

25  way he will be precluded from communicating with any

28

1  individual or association to any organized crime groups,

2  or any criminal enterprise including any terrorist group.

3         He shall not possess a firearm, ammunition or

4  any type of destructive device.  And there is a search

5  condition.  There is a $100 special assessment.

6         And the defendant shall submit his person,

7  property, house, residence, vehicle, papers, computers,

8  anything that is under his control, data storage devices

9  or media, anything that is under his control to a search

10  conducted by any United States probation officer.  And

11  failure to submit to any search may be grounds for

12  revocation of release.

13         He shall warn any other occupants of the

14  premises that it may be subject to search pursuant to this

15  condition.  And an officer may in fact conduct a search

16  pursuant to this condition when reasonable suspicion

17  exists that the defendant has violated a condition of his

18  supervision, and that the areas to be searched contain

19  evidence of this violation.  Although any search must be

20  conducted at a reasonable time and in a reasonable manner.

21         That concludes the sentence of the Court.

22         MR. DURHAM:  Your Honor, just a couple of

23  housekeeping items.

24         The special assessment is $100 for each count?

25         THE COURT:  Right, $200, yes.

1    MR. DURHAM:  And the Court is finding the
2  defendant has no ability to pay a fine, correct?
3    MR. BOGATIN:  Your Honor, yes.  The defendant
4  has no assets since he has been incarcerated, obviously.
5    MR. DURHAM:  And lastly, I'll just put on the
6  record that there was an appellate waiver.  But can we
7  just have the Court ask defense counsel to advise him of
8  any appellate rights he may have.
9    THE COURT:  Of course.  You will advise him of
10  his right to appeal, correct?
11    MR. BOGATIN:  Yes, your Honor.
12    And one housekeeping point.  And would the Court
13  recommend to the Bureau of Prisons that he be designated
14  close to the family who is present in court?  His parents,
15  his siblings, they have been visiting him once a week at
16  Brooklyn MDC.  And they would like to visit him.
17    THE COURT:  I never take a position on that.
18  The Bureau will determine where he should be placed.  And
19  I will make no recommendation.
20    MR. BOGATIN:  Yes, your Honor.
21    And I believe there are open counts.
22    MR. DURHAM:  Lastly, your Honor, we move to
23  dismiss Counts One, Two and Five.
24    THE COURT:  And you certainly join in that,
25  correct?

30

1          MR. BOGATIN:  Yes.

2          THE COURT:  And that is approved.

3          Thank you.

4          MR. BOGATIN:  Thank you, your Honor.

5          (The proceedings were concluded at 11:23 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25