UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
MARCOS ZEA,

                    Petitioner,

        - against -

UNITED STATES OF AMERICA,

                    Respondent.

-----------------------------------------------------X

13 CR 72 (SJF-AKT)

Civ. No._____

### MEMORANDUM OF LAW IN SUPPORT OF PETITIONER MARCOS ZEA'S PETITION PURSUANT TO 28 U.S.C. §2255 TO VACATE HIS SENTENCE ON THE GROUNDS OF INEFFECTIVE ASSISTANCE OF COUNSEL

Joshua L. Dratel
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
29 Broadway, Suite 1412
New York, New York 10006
(212) 732-0707
jdratel@joshuadratel.com

*Attorneys for Petitioner Marcos Zea*

*– Of Counsel –*

Joshua L. Dratel
Lindsay A. Lewis
Whitney G. Schlimbach

TABLE OF CONTENTS

Table of Contents.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Jurisdiction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Statement of the Facts

A.      *Procedural Background*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

B.      *Factual Background*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

C.      *Mr. Zea's Guilty Plea and Plea Agreement*.. . . . . . . . . . . . . . . . . . . . . . . . . . .  7

D.      *Mr. Zea's Sentencing*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

E.      *Mr. Zea's Direct Appeal.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

ARGUMENT

POINT I

MR. ZEA'S COUNSEL WAS INEFFECTIVE AT
SENTENCING BECAUSE HE DID NOT PROVIDE
THE COURT WITH MATERIAL BACKGROUND
INFORMATION ABOUT MR. ZEA AND THE
RELEVANT CONTEXT FOR HIS OFFENSE CONDUCT. . . . . . . . . . . . . . . . . . . . . . . . . . 11

A.      *The Principles Guiding Determinations of Ineffective Assistance of Counsel.* . . . . . . . . 12

      1.      *Claims of Ineffective Assistance of Counsel Are More
              Appropriately Raised In a Petition Pursuant to §2255.*. . . . . . . . . . . . . . . . . 12

      2.      *The Standards for Reviewing a Claim of Ineffective Assistance of Counsel.*. . . . . 13

      3.      *The Standard for Establishing Ineffective Assistance of Counsel.*. . . . . . . . . . . 14

      4.      *Effective Assistance of Counsel Is Required at Sentencing.*. . . . . . . . . . . . . . . . 15

5.      *The Waiver Provision In the Plea Agreement Does Not, and Cannot, Bar a Subsequent Claim of Ineffective Assistance of Counsel*. . . . . . . . . 16

B.      *Counsel's Written and Oral Sentencing Presentations Failed to Include Any Mitigating Background or Personal History Information for Mr. Zea.* . . . . . . . . . . 19

C.      *The Account of Mr. Zea's Change from College Student and Prospective U.S. Soldier to Willing Enabler of a Terrorist Organization Is Compelling and Mitigating.* . . . . . . . . . . . . . . . . . . . . . . . . 20

D.      *The Court Should Remedy Counsel's Ineffective Assistance by Re-sentencing Mr. Zea.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

POINT II

MR. ZEA'S COUNSEL WAS INEFFECTIVE AT
SENTENCING BECAUSE HE FAILED TO EXPLOIT
CERTAIN RESOURCES THAT ARE COMMONLY
USED IN SENTENCING MITIGATION FOR
DEFENDANTS WHO PLEAD GUILTY TO
FEDERAL TERRORISM-RELATED OFFENSES    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

POINT III

MR. ZEA'S COUNSEL WAS INEFFECTIVE
AT SENTENCING BECAUSE HE FAILED TO
SEEK AN ADJOURNMENT IN ORDER TO VERIFY
THE DESCRIPTION OF OTHER CASES FOR
COMPARATIVE PURPOSES, AND/OR FAILED TO
CITE INCONTROVERTIBLE STATISTICAL
INFORMATION TO SUPPORT MR. ZEA'S POSITION . . . . . . . . . . . . . . . . . . . . . . . . . . 36

POINT IV

MR. ZEA'S COUNSEL WAS INEFFECTIVE
AT SENTENCING BECAUSE HE RELIED
UPON A FUTILE AND FRIVOLOUS ARGUMENT WHILE
IGNORING AN EFFECTIVE ALTERNATIVE POSITION  . . . . . . . . . . . . . . . . . . . . . . . . . 42

A.      *Mr. Zea's Counsel Should Not Have Objected to the Terrorism Enhancement.* . . . . . . . 43

B.    *Mr. Zea's Counsel Should Instead Have Advanced the Position That the Terrorism Enhancement Always and Automatically Increases a Defendant's Guidelines Range Regardless of the Nature of His Conduct* . . . . . . . . . . . . 43

      1.    *The Automatic Application of the Guidelines' Terrorism Enhancement Should Be Remedied By Resort to the §3553(a) Sentencing Factors.* . . . . . . . . . 44

      2.    *Increasing Mr. Zea's Criminal History Category From Category I to Category VI Grossly Overstates His Criminal History.* . . . . . . . . . 48

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

TABLE OF AUTHORITIES

CASES

*Bennett v. United States*, 2006 WL 738162 (S.D.N.Y. Mar. 22, 2006)... . . . . . . . . . . . . . . . . . . . . 15

*Clay v. United States*, 537 U.S. 522 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5

*Czernicki v. United States*, 270 F.Supp.2d 391 (S.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . . . . . . 52

*Evitts v. Lucey,* 469 U.S. 387 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gall v. United States*, 552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Garcia-Santos v. United States*, 273 F.3d 506 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Glover v. United States,* 531 U.S. 198 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

*Graham v. Florida*, 560 U.S. 48 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Halbert v. Michigan,* 545 U.S. 605 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hodgson v. Warren*, 622 F.3d 591 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Johnson v. Zerbst*, 304 U.S. 458 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Kimbrough v. United States*, 552 U.S. 85 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-46

*Lafler v. Cooper*, 566 U.S. 156 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

*Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Massaro v. United States*, 538 U.S. 500 (2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*McMann v. Richardson*, 397 U.S. 759 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*McWilliams v. Dunn*, ___ U.S. ___,137 S. Ct. 1790 (2017). . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Missouri v. Frye*, 566 U.S.134 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mempa v. Rhay,* 389 U.S. 128 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Miller v. Alabama*, 567 U.S. 460 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Montejo v. Lousiana*, 556 U.S. 778 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Newfield v. United States*, 565 F.2d 203 (2d Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Puglisi v. United States*, 586 F.3d 209 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Roper v. Simmons*, 543 U.S. 551 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Skidmore v. Swift & Co.,* 323 U.S. 134 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Strickland v. Washington*, 466 U.S. 668 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-16

*United States v. Adams*, 448 F.3d 492 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Arnaout*, 431 F.3d 994 (7th Cir 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Attar*, 38 F.3d 727 (4th Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Awan*, 607 F.3d 306 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Benkahla*, 501 F.Supp.2d 748 (E.D.VA 2007)
(*affirmed*, 530 F.3d 300 (4th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010).. . . . . . . . . . . . . . . . . . . . . . . . 44-48, 52

*United States v. Garafola*, ___ F.Supp.2d.___ , 2012 WL 6622684 (S.D.N.Y. 2012). . . . . . . . 12

*United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . 44-45

*United States v. Landa*, 281 F.Supp.2d 1139 (N.D.Cal. 2003). . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Meskini*, 319 F. 3d 88 (2d Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Ministro-Tapia,* 470 F.3d 137 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Morales*, 105 Fed.Appx. 308 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Pattee*, 820 F.3d 496 (2d Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Ready*, 82 F.3d 551 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*United States v. Santos*, 152 Fed.Appx. 24 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Venturella*, 391 F.3d 120 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Wade,* 388 U.S. 218 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Vargas v. United States*, 819 F.Supp.2d 366 (S.D.N.Y. 2011). . . . . . . . . . . . . . . . . . . . . . . 13-14

*Wiggins v. Smith,* 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Wojtowicz v. United States*, 550 F.2d 786 (2d Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Yick Man Mui v. United States*, 614 F.3d 50 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## STATUTES

U.S. Const. Amend. XI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 15, 18, 42, 52

18 U.S.C. § 956(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 956(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 1512(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 1512(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

18 U.S.C. § 2332. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

18 U.S.C. § 2339A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40

18 U.S.C. § 2339A(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 2339B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 38, 40

18 U.S.C. § 2339B(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-45, 47

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 43-44, 47-49, 52

18 U.S.C. § 3553(a)(1)............................................................ 50-51

18 U.S.C. § 3553(a)(2)............................................................ 41, 50

18 U.S.C. § 3553(a)(6)............................................... 2, 10, 37-38, 41

18 U.S.C. § 3582................................................................... 8

28 U.S.C. §2255........................................... 1, 3-5, 8, 12-13, 18, 53

28 U.S.C. § 2255(f)............................................................... 4

28 U.S.C. § 2255(f)(1)........................................................... 5

U.S.S.G. § 2G2.2............................................................. 44-47

U.S.S.G. § 3A1.4.................................. 3, 42, 44-45, 48-49, 52

U.S.S.G. § 3A1.4(b)....................................................... 48-49, 52

U.S.S.G. § 4A1.3........................................................... 49-50

U.S.S.G. § 4A1.3(b)(1)......................................................... 49

Rule 11, Fed.R.Crim.Pro.......................................................... 9

Rule 11(b)(1), Fed.R.Crim.Pro................................................... 11

Rule 11(c)(6), Fed.R.Crim.Pro................................................... 16

## OTHER

Amanda E. Guyer et. al. *Amygdala and Ventrolateral Prefrontal Cortex Function During Anticipated Peer Evaluation in Pediatric Social Anxiety*, 65 Arch. Gen. Psychiatry 1303 (2008). ................. 32

Barry C. Feld et. al.*, Adolescent Competence and Culpability: Implications of Neuroscience for Juvenile Justice Administration*, in Stephen Morse & Adina Roskies, eds., *A Primer on Criminal Law and Neuroscience* (New York:  Oxford University Press, 2013). .................... 31-32

Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They  Rest*, 17 Hofstra L. Rev. 1 (Fall 1988). ....................................... 50-51

David O. Brink, *Immaturity, Normative Competence, and Juvenile Transfer: How (Not) to Punish Minors for Major Crimes*, 82 Tex. L. Rev. 1555 (2004). . . . . . . . . 31

David Pimentel, "The Widening Maturity Gap: Trying and Punishing Juveniles as Adults in an Era of Extended Adolescence ," Texas Tech Law Review, Vol. 46, 2013. . . . . . . . . . . 33

E. Cauffman & Laurence Steinberg, "(Im)Maturity of Judgement in a Adolescence: Why Adolescents May Be Less Culpable Than Adults," 18 *Behavioral Sciences & Law* 741 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Elizabeth S. Scott & Laurence Steinberg, *Blaming Youth*, 81 Tex. L. Rev. 799 (2003). . . . . 31-32

Erik H. Erikson, *Childhood and Society*, (W.W. Norton: 1993). . . . . . . . . . . . . . . . . . . . . . . . 29

Fathali Moghaddam, *The Staircase to Terrorism: A Psychological Exploration*, 60 American Psychologist 161 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

John Horgan, Ph.D., *What Makes a Terrorist Stop Being a Terrorist?*, 1 J. for De-radicalization 1 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 Developmental Review 76 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Lidwien Kapteijns and Abukar Arman, *Educating Immigrant Youth in the United States: An Exploration of the Somali Case*, 4 Bildhaan: An International Journal of Somali Studies 18 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Mubin Shaikh, *Countering Violent Extremism Online: An Anecdotal Case Study Related to Engaging ISIS Members and Sympathizers on Twitter,* 98 Soundings 478 (2015). . . . . . . . . . . . . . . . . . 35

Peter Bergen, *United States of Jihad: Who Are America's Homegrown Terrorists, and How Do We Stop Them?*, (Crown: 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Steinberg, Cauffman, Woolard, Graham & Banich, "Are Adolescent Less Mature Than Adults? Minors Access to Abortion, the Juvenile Death Penalty, and the Alleged ABA 'Flip-Flop,'" *American Psychologist*, Vol. 64, No. 7 (2009). . . . . . . . . . . . . . . . . . . . . . . . 33

Stephen Kinzer, *Bitter Fruit: The Story of the American Coup in Guatemala* (David Rockefeller Center for Latin American Studies:  1982/2005 [revised edition]). . 24

Todd A. Hare et. al., *Biological Substrates of Emotional Reactivity and Regulation in Adolescence During an Emotional Go-Nogo Task,* 63 Biological Psychiatry 927 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Introduction**

Marcos Zea's saga is a tragic tale of a son of hard-working immigrant Latin American parents who, due to a series of events and influences, departed from that lifestyle, converted to Islam, and sought to travel to Yemen to assist a Foreign Terrorist Organization (hereinafter "FTO"), and to aid others in doing the same.  Prosecuted for his offenses, Mr. Zea pleaded guilty, but received the maximum possible sentence – 25 years' imprisonment – available under the statutes of conviction.

Yet the Court was never informed of the factors that led to that regrettable transformation, and which provided ample reason for a sentence below the maximum.  The Court was not presented with other aspects of Mr. Zea's background and history that would have moderated that sentence – that at various points, Mr. Zea's life could have taken a dramatically different, and entirely legal, path, but that events and circumstances beyond his control closed those avenues for him.  Nor was the Court informed of many positive aspects of Mr. Zea's character and conduct.

This Petition, pursuant to 28 U.S.C. §2255, on behalf of Mr. Zea seeks re-sentencing because his counsel failed to provide effective assistance as guaranteed by the Sixth Amendment to the Constitution.  As set forth below, counsel's performance was deficient in several respects, and Mr. Zea was prejudiced as a result because he received a longer prison sentence – in fact, the maximum permissible under the statutes to which he pleaded guilty – than he would have had counsel satisfied his Sixth Amendment obligations.

As detailed below, counsel's ineffective assistance was manifested in the following respects:

1

(1)    counsel failed to provide the Court a narrative that would have explained how Mr. Zea transformed from a young man of Hispanic, Latin American, and Catholic heritage to a young adult willing to travel overseas to join an Islamic terrorist organization, and to help others to do so as well. Indeed, counsel failed to provide background information that would have provided necessary and informative context regarding Mr. Zea's offense conduct, including who and what influenced him, as well as provided a full and balanced account of Mr. Zea's personal history and good works in his community. As a result, the Court was left with only a one-sided, wholly negative impression of Mr. Zea and his prospects for the future;

(2)    counsel failed to avail himself of certain resources that are typical and necessary in cases involving allegations of terrorism, which are unusual and in many ways idiosyncratic, and which would have provided the Court with considerable scholarship and experience demonstrating that Mr. Zea's commitment to an FTO was the product of sophisticated, targeted recruitment of impressionable, vulnerable young Muslim males;

(3)    when confronted with the Court's challenge with respect to the reliability of certain materials presented in connection with cases counsel sought to use to compare to Mr. Zea, counsel failed to seek an adjournment to permit him to gather appropriate documents to verify the facts and results in those cases to demonstrate that sentencing Mr. Zea to 25 years' imprisonment would, contrary to 18 U.S.C. §3553(a)(6), create an unwarranted sentencing disparity, and/or failed to utilize the various indisputable statistical analyses of terrorism cases and sentencing that

2

exist;  and

(4)     counsel should *not* have contested the Sentencing Guidelines' 12-point terrorism enhancement pursuant to §3A1.4, not only because to do so was futile, but also because it eviscerated counsel's credibility with the Court, who described counsel as "somewhat disingenuous" for advancing that argument, and should instead have advocated an alternative position to alleviate the impact of the terrorism enhancement.

All of these deficiencies in counsel's performance – either individually or in aggregate – not only produced a materially substandard sentencing presentation on Mr. Zea's behalf, but also, it is respectfully submitted, affected Mr. Zea's sentence, which was imposed without the benefit of a proper and complete submission on his behalf.

As discussed below, prosecutions charging terrorism-related offenses have important differences that counsel must recognize and address in the context of sentencing and mitigation. Here, counsel's admitted inexperience in such cases detracted significantly from his performance to the serious detriment of Mr. Zea.

Thus, in addition to identifying the instances of ineffective assistance by counsel at sentencing, this Petition presents to the Court the information and advocacy that the sentencing presentation on Mr. Zea's behalf, cognizant of the peculiarities of terrorism-related cases, *should* have included, and which, it is respectfully submitted, would have made a difference in the sentence imposed.

Accordingly, it is respectfully submitted that Mr. Zea's §2255 petition be granted, and that he be re-sentenced.

**Jurisdiction**

A.      *Mr. Zea's Motion Meets the Timing and*
        *Custody Requirements Set Forth In 28 U.S.C. § 2255*

The limitation period applicable to Mr. Zea's motion pursuant to 28 U.S.C. § 2255 is

governed by § 2255(f), which states that "[a] 1-year period of limitation shall apply to a motion

under this section."   28 U.S.C. § 2255(f).  As set forth in § 2255(f), "[t]he limitation period shall

run from the latest of – "

> (1)     the date on which the judgment of conviction becomes
>          final;
>
> (2)     the date on which the impediment to making a motion
>          created by governmental action in violation of the
>          Constitution or laws of the United States is removed, if the
>          movant was prevented from making a motion by such
>          governmental action;
>
> (3)     the date on which the right asserted was initially recognized
>          by the Supreme Court, if that right has been newly
>          recognized by the Supreme Court and made retroactively
>          applicable to cases on collateral review;  or
>
> (4)     the date on which the facts supporting the claim or claims
>          presented could have been discovered through the exercise
>          of due diligence.

*Id*.

Here, because Mr. Zea did not file a petition for a writ of certiorari to the United States

Supreme Court, the relevant date is 90 days from the "date on which the judgment of conviction

became final."  As the Supreme Court has stated, the one-year limitation period begins to run

when the "when the time expires for filing a petition for certiorari [to the Supreme Court]

contesting the appellate court's affirmation of the conviction."  *See Clay v. United States*, 537 U.S.

4

522, 525-527 (2003) ("[f]inality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires").

The Second Circuit affirmed Mr. Zea's conviction September 1, 2016, thus commencing the 90-day period to file a petition for a writ of certiorari. The 90-day period expired November 30, 2016, which is the date on which the one year statute of limitations for filing a habeas petition pursuant to § 2255 began to run. Consequently, the Petition has been filed within one year of November 30, 2016, and is timely filed pursuant to §2255(f)(1).

Mr. Zea pleaded guilty September 9, 2015, pursuant to a Plea Agreement, to one count of material support to a Foreign Terrorist Organization (al Qaeda in the Arabian Peninsula), in violation of 18 U.S.C. §2339B, and one count of obstruction of justice. 18 U.S.C. §1512(c)(2).

The Court sentenced Mr. Zea April 20, 2015, to 300 months' imprisonment followed by a three year term of supervised release. He is currently confined at FCI Hazelton, a federal Bureau of Prisons facility, and thus satisfies the federal confinement requirement of §2255.

## Statement of the Facts

**A.**     *Procedural Background*

Marcos Zea was arrested October 18, 2013, and charged in five counts: Conspiracy to Commit Murder in a Foreign Country [18 U.S.C. § 956(a)(1) & (2)], Attempt to Provide Material Support to Terrorists [18 U.S.C. § 2339A(a)], Attempt to Provide Material Support to a Foreign Terrorist Organization [18 U.S.C. § 2339B(a)(1)], Obstruction and Attempted Obstruction of an Official Proceeding [18 U.S.C. § 1512(c)(1)], and Attempted Obstruction of an Official Proceeding [18 U.S.C. § 1512(c)(1) & (2)]. *See* October 17, 2013 Indictment (Dkt#39)

5

(hereinafter "Indictment").

The overt acts alleged in support of Count One (Conspiracy to Commit Murder in a Foreign Country) against Mr. Zea were his (1)  December 15, 2011, purchase of an airline ticket for travel from JFK Airport to Aden, Yemen, with connections in London, England, Istanbul, Turkey, and Amman, Jordan;  (2)  boarding of the flight at JFK Airport to London, England on January 4, 2012;  and (3)  provision of "United States currency to John Doe #1 and John Doe #2" on January 18, 2013.  *See* Indictment, at ¶¶ 2(a), (b), & (c).

The material support counts arose from Mr. Zea's intentional attempt to provide "currency, monetary instruments and personnel, including himself" for use in an act which would constitute murder or maiming and to *al Qaeda*.  Indictment, at ¶¶ 3-4.

The obstruction and attempted obstruction counts alleged against Mr. Zea arose from the "alter[ation], destr[uction], mutilat[ion], and conceal[ment]" of three hard drives and the "obstruct[ion], influenc[ing], and imped[ing]" of the "Grand Jury Terrorism Investigation." Indictment, at ¶¶ 5-6.

**B.**     *Factual Background*

As set forth in greater detail **post**, Mr. Zea converted to Islam during college, and began attending mosque regularly while attending college and working part-time.  During this period, Mr. Zea began having contact with his co-defendant, Justin Kaliebe, who, in turn, was in contact with an undercover agent.  The undercover agent recorded conversations between himself, Mr. Zea and Mr. Kaliebe.  *See* December 10, 2014, Draft Pre-Sentence Report (hereinafter "Draft PSR"), at ¶ 10.

Near the end of 2011, Mr. Zea purchased a plane ticket from the United States to Yemen,

6

with "the intention of trying to join Ansar Al-Sharia, otherwise known as Al-Queda" and boarded

a flight from JFK Airport to London on January 4, 2012, with an ultimate destination of Aden,

Yemen.  *See* Transcript of Change of Plea Hearing (hereinafter "Plea Transcript"), at 18-19,

*United States v. Marcos Zea*, 13 Cr. 72 (SJF-AKT).

In London, Mr. Zea was detained at the airport because he did not have a proper visa to

enter Yemen, and was subsequently returned to the United States.  *See* Draft PSR, at ¶ 11.

Although Mr. Zea did not attempt another trip, he "provided money to Mr. Kaliebe . . . to assist"

in Mr. Kaliebe's efforts to travel out of the country to join Al-Queda.  Plea Transcript, at 23.

With respect to the conduct underlying the obstruction charges, in or about April 2013 Mr.

Zea "told [his] friend to erase [Mr. Zea's] hard drives because [he] was being investigated by the

FBI."  Plea Transcript, at 21.  Mr. Zea was arrested October 18, 2014, at his home in Brentwood,

New York.  *See* Draft PSR, at ¶ 23.

**C.**    ***Mr. Zea's Guilty Plea and Plea Agreement***

Pursuant to a September 9, 2014 Plea Agreement, Mr. Zea pleaded guilty to Count Three

[Attempt to Provide Material Support to a Foreign Terrorist Organization, in violation of 18

U.S.C. 2339B(a)(1)], which carried a maximum prison sentence of 15 years, and Count Four

[Obstruction and Attempted Obstruction of an Official Proceeding, in violation of 18 U.S.C.

§1512(c)(2)], which carried a maximum prison sentence of 20 years.  *See* September 9, 2014, Plea

Agreement (hereinafter "Plea Agreement"), at 1-2.

The Plea Agreement specified that the sentences on each count could be run consecutively

to each other and memorialized the agreement between Mr. Zea and the United States Attorney's

Office ("USAO") that "a sentence of between zero and twenty-five years' imprisonment with a

7

maximum term of supervised release of life is the appropriate range of imprisonment and term of

supervised release in this case."  Plea Agreement, at 2-3.

Furthermore, the Plea Agreement contained the following waiver provision:

> The defendant agrees not to file an appeal or otherwise challenge, by motion pursuant to 18 U.S.C. § 3582, petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 300 months or below.  This waiver is binding without regard to the sentencing analysis used by the Court.

Plea Agreement, at 3.

**D.    *Mr. Zea's Sentencing***

Following his guilty plea, Mr. Zea was sentenced April 20, 2013, to 180 months

imprisonment on Count Three and 120 months imprisonment on Count Four to run consecutively,

for a total of 300 months imprisonment followed by three years supervised release.  *See* April 20,

2013, Sentencing Hearing Transcript (hereinafter "Sentencing Transcript"), at 26, *United States v.

Marcos Zea*, 13 Cr. 72 (SJF-AKT).

In imposing sentence, Judge Feuerstein cited the need for "personal deterrence" of Mr. Zea

"[b]ecause despite efforts by others to dissuade [Mr. Zea] and in fact actually roadblocks that were

placed in his path, he continued to pursue efforts to further along, if not his own ability to join

these groups, then to help others do so."  Sentencing Transcript, at 25.

Additionally, Judge Feuerstein pointed to general deterrence when formulating the

sentence "because this is, as you have said, a most serious crime," for which "there has to be a

message sent to others that this is absolutely not acceptable behavior . . . in light of the times in

which we are living."  *Id*., at 26.  As noted **ante**, Mr. Zea is currently serving his sentence at FCI

8

Hazelton, in Bruceton Mills, West Virginia.

**E.**     *Mr. Zea's Direct Appeal*

Mr. Zea filed a Notice of Appeal April 22, 2015, which was docketed in the Second

Circuit May 6, 2015, following the issuance of the May 1, 2015, Judgment.  The government filed

a Motion to dismiss the direct appeal May 20, 2015, citing the provision in the Plea Agreement

that Mr. Zea was not permitted "to file an appeal or otherwise challenge a conviction or sentence

if the term of imprisonment imposed was 300 months or below."  *See* Government Motion to

Dismiss Appeal (hereinafter "Motion to Dismiss"), at 1, *United States v. Marcos Zea*, 15 Cr.

1531, (Dkt#26).

Mr. Zea filed his opening brief October 13, 2015, in which he responded to the Motion to

Dismiss and additionally, filed a separate reply to the Motion to Dismiss on January 11, 2016.

*See* Marcos Zea Appeal Brief (hereinafter "Appeal Brief"), at 13, *United States v. Marcos Zea*, 15

Cr. 1531 (Dkt#38); *see also* Reply to Motion to Dismiss, 15 Cr. 1531, (Dkt#66).  The Second

Circuit Court of Appeals denied the Motion to Dismiss February 22, 2016, citing the holding in

*United States v. Adams*, 448 F.3d 492, 497 (2d Cir. 2006), "that defendant retains right to contend

on appeal that there were errors in the guilty plea proceedings, despite appeal waiver."  February

22, 2016, Order, *United States v. Marcos Zea*, 15 Cr. 1531, (Dkt#71).

 In his brief, Mr. Zea argued first that his plea should be vacated for failure to satisfy the

requirements of Rule 11, Fed.R.Crim.Pro., because the District Court did not clearly inform him

of his "right to be represented by counsel . . . at every . . . stage of the proceeding," of his "right to

testify . . . and to compel the attendance of witnesses," and the nature and impact of the direct

appeal and collateral attack waivers contained in the Plea Agreement, thus failing to "ensure that a

knowing and intelligent plea was given."  Appeal Brief, at 16-17.

Alternatively, Mr. Zea argued for re-sentencing on the ground that the sentence imposed was procedurally and substantively unreasonable, due to the District Court's failure to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," pursuant to 18 U.S.C. § 3553(a)(6), by refusing to consider "counsel's argument regarding comparable sentences" in other terrorism cases.  Appeal Brief, at 23-28.

The government responded May 20, 2016, citing *United States v. Pattee*, 820 F.3d 496 (2d Cir. 2016), for the principle that the "deviation from proper procedure [with respect to complying strictly with Rule 11,] did not affect substantial rights because the full record demonstrates" that Mr. Zea "was aware of the essence of those rights" despite his not being "specifically advised" of them during the plea colloquy.  Brief and Appendix for the United States (hereinafter "Government Appeal Brief"), at 16,  *United States v. Marcos Zea*, 15 Cr. 1531, (Dkt#79).

Regarding Mr. Zea's claim that his sentence was procedurally and substantively unreasonable, the government cited to the transcript of the sentencing proceeding to demonstrate the District Court's "awareness of the § 3553(a) factors in considering an appropriate sentence," and argued that Mr. Zea's sentence is not "one of the exceptional cases where the trial court's decision cannot be located within the range of permissible decisions."  Government Appeal Brief, at 19-22 (internal quotations and citations omitted).  Mr. Zea filed a Reply June 24, 2016.  *See* Marcos Zea Reply Brief, *United States v. Marcos Zea*, 15 Cr. 1531, (Dkt#90).

As noted **ante**, the Second Circuit issued its decision affirming Mr. Zea's conviction and

sentence September 1, 2016.  *See* September 1, 2016, Summary Order and Judgment (hereinafter

"Summary Order"), *United States v. Marcos Zea*, 15 Cr. 1531 (Dkt#99).  The Second Circuit

sustained the guilty pleas and convictions because Mr. Zea failed to demonstrate "a reasonable

probability that he would not have pleaded guilty but for the purported Rule 11(b)(1) errors, or

even that he misapprehended his rights when he pleaded guilty."  *Id.*, at 3.

In addition, the Second Circuit did not reach the issue of whether Mr. Zea's sentence was

procedurally and substantively reasonable, holding that the challenge to his sentence was barred

by the "valid and enforceable" waiver of his right to appeal or challenge a sentence of or less than

300 months imprisonment.  *Id.*, at 4.

**ARGUMENT**

**POINT I**

**MR. ZEA'S COUNSEL WAS INEFFECTIVE AT
SENTENCING BECAUSE HE DID NOT PROVIDE
THE COURT WITH MATERIAL BACKGROUND INFORMATION
ABOUT MR. ZEA AND THE
RELEVANT CONTEXT FOR HIS OFFENSE CONDUCT**

Mr. Zea's counsel failed to provide Mr. Zea effective assistance of counsel as guaranteed

by the Sixth Amendment.  That ineffectiveness consisted of several elements, including counsel's

abject failure to provide the Court – either in writing or orally – the requisite narrative that would

have offered an explanation – not an excuse – for Mr. Zea's metamorphosis from a young man

interested in joining the U.S. military to one willing to provide material support to a designated

terrorist organization.

11

A.      *The Principles Guiding Determinations of Ineffective Assistance of Counsel*

The Sixth Amendment to the U.S. Constitution guarantees each criminal defendant effective assistance of counsel.  *See Missouri v. Frye*, 566 U.S.134, 138 (2012) ("Sixth Amendment . . . provides that the accused shall have the assistance of counsel in all criminal prosecutions");  *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970) ("the right to counsel is the right to the effective assistance of counsel").[1]

   1.      *Claims of Ineffective Assistance of Counsel Are More Appropriately Raised In a Petition Pursuant to §2255*

Effective assistance of counsel is required during all facets of counsel's representation, and claims related to counsel's deficient performance are appropriately raised on collateral attack.  *See Montejo v. Lousiana*, 556 U.S. 778, 786 (2009) (the right to effective assistance of counsel applies to "all 'critical' stages of the criminal proceedings").  *See also Massaro v. United States*, 538 U.S. 500, 508-509 (2003) (ineffective assistance of counsel claims are excepted from the general rule that claims raised in a §2255 petition, but not raised on direct appeal, are procedurally defaulted, and a §2255 petition is the preferred means of raising the issue).

Indeed, because customarily an appropriate record on the issue is not developed at the trial level, in *Massaro* the Court recognized that litigating ineffective assistance claims on direct appeal would be impractical.  As a result, the "failure to raise [such a] claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under §2255."  *Massaro*, 538 U.S. at 509.  *See also Yick Man Mui v. United States*, 614 F.3d 50, 55 (2d Cir. 2010);  *United States v. Garafola*, ___ F.Supp.2d.___ , 2012 WL 6622684, *11 (S.D.N.Y. 2012).

---

[1]  The legal standards set forth in this section (A) apply to all subsequent points in this Petition, but are not repeated therein.

12

Conversely, on direct appeal courts often expressly refrain from reviewing ineffective assistance claims, citing §2255 as the more appropriate vehicle for review of such claims. *See, e.g., United States v. Santos*, 152 Fed.Appx. 24, 26 (2d Cir. 2005); *see also United States v. Venturella*, 391 F.3d 120, 135 (2d Cir. 2004). Thus, ineffective assistance claims instituted in a §2255 petition are *always* reviewable, even if they were not raised on direct appeal. *United States v. Morales*, 105 Fed.Appx. 308, 311 (2d Cir. 2004).

### 2.     *The Standards for Reviewing a Claim of Ineffective Assistance of Counsel*

In evaluating claims of ineffective assistance of counsel, the Court is obligated to conduct a hearing on the claims raised "unless the motion and the files and records of the case conclusively show that the [Petitioner] is entitled to no relief." *Vargas v. United States*, 819 F.Supp.2d 366, 375 (S.D.N.Y. 2011); *see also Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009).

Otherwise, the presence of any disputed material fact, or a demonstration by the petitioner that he "may be able to establish at a hearing a prima facie case for relief," warrants a hearing on the petitioner's claim(s). *Vargas*, 819 F.Supp.2d at 375.

In deciding whether a hearing is warranted, the Court must consider the record in the light most favorable to the petitioner, and cannot rely merely on "[t]he apparent regularity of the proceedings" to conclude that the claim of ineffective assistance of counsel is without merit. *Newfield v. United States*, 565 F.2d 203, 207 (2d Cir. 1977), *quoting Wojtowicz v. United States*, 550 F.2d 786, 790 (2d Cir. 1977).

As a result, when asserting an ineffective assistance of counsel claim, the petitioner is required to "establish only that he has a 'plausible' claim . . . not that 'he will necessarily succeed

13

on the claim.'" *Vargas*, 819 F.Supp.2d at 377, *quoting Puglisi*, 586 F.3d at 213.  Here, as demonstrated below, Mr. Zea has more than satisfied that low threshold.

### 3.    *The Standard for Establishing Ineffective Assistance of Counsel*

The applicable legal standard for establishing a claim of ineffective assistance of counsel was set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, at 668, 687-688, 694 (1984), which prescribed a two-prong inquiry requiring that petitioner demonstrate both that (1)  "counsel's performance was deficient" in that it fell "below an objective standard of reasonableness" as determined by the legal community's practice and expectations;  and  (2)  there is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would be different."  *Id*.

Also, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Id*., at 690.  Thus, "[t]he court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  *Id*.

While "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[,]" it should at the same time, "[i]n making that determination, . . . keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case."  *Id*.

In analyzing claims of ineffective assistance, the reviewing Court "need not decide whether one or another or less than all of [the] errors would suffice" to render counsel's

performance constitutionally deficient because, pursuant to *Strickland*, the Court should "consider

the[] errors in the aggregate" to determine whether the attorney's actions "fell outside the wide

range of professionally competent assistance." *Lindstadt v. Keane*, 239 F.3d 191, 199, 204 (2d

Cir. 2001) (internal quotations omitted), *quoting Strickland*, 466 U.S. at 690, 695-96; *see also*

*Bennett v. United States*, 2006 WL 738162, at *14 (S.D.N.Y. Mar. 22, 2006) ("case law in the

Second Circuit is clear that the Court must consider claimed errors in the aggregate, . . . and their

cumulative weight").

### 4.   *Effective Assistance of Counsel Is Required at Sentencing*

The Sixth Amendment right to effective assistance of counsel applies at sentencing.  In

*Lafler v. Cooper*, 566 U.S. 156 (2012), the Court explained that

> [t]he Sixth Amendment requires effective assistance of counsel at
> critical stages of a criminal proceeding. Its protections are not
> designed simply to protect the trial, even though "counsel's absence
> [in these stages] may derogate from the accused's right to a fair
> trial." *United States v. Wade,* 388 U.S. 218, 226 (1967).  The
> constitutional guarantee applies to pretrial critical stages that are
> part of the whole course of a criminal proceeding, a proceeding in
> which defendants cannot be presumed to make critical decisions
> without counsel's advice.  This is consistent, too, with the rule that
> defendants have a right to effective assistance of counsel on appeal,
> even though that cannot in any way be characterized as part of the
> trial.  *See*, *e.g., Halbert v. Michigan,* 545 U.S. 605 (2005);  *Evitts v.
> Lucey,* 469 U.S. 387 (1985).  The precedents also establish that
> there exists a right to counsel during sentencing in both noncapital,
> *see Glover v. United States,* 531 U.S. 198, 203-204 (2001);  *Mempa
> v. Rhay,* 389 U.S. 128 (1967), and capital cases, *see Wiggins v.
> Smith,* 539 U.S. 510, 538 (2003).

566 U.S. at 165.

Thus, as the Court in *Lafler* added, "[e]ven though sentencing does not concern the

defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing can

result in *Strickland* prejudice because "any amount of [additional] jail time has Sixth Amendment significance.'" *Id.*, *quoting Glover*, 531 U.S. at 203.

> **5.  *The Waiver Provision In the Plea Agreement Does Not, and Cannot, Bar a Subsequent Claim of Ineffective Assistance of Counsel***

Federal prosecutors within the Second Circuit routinely include waiver language similar to that found here in plea agreements, and, if accepted and executed, a defendant is deemed to forego his right to direct appeal and/or to institute a collateral attack on the conviction and/or sentence. *Cf.* USDOJ, *Plea Agreements and Sentencing Appeal Waivers — Discussion of the Law*, 9 United States Attorneys' Manual: Criminal Resource Manual 626 (available at http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/ crm00626.htm).

Courts generally enforce these provisions as part of an agreed-upon bargain. *See United States v. Quinones*, 511 F.3d 289, 323 (2d Cir. 2007) ("the waiver was entered as part of a plea agreement process that permitted the defendant and the government to allocate risk, to obtain benefits, to achieve finality and to save resources."); *see* Fed.R.Crim.P. 11(c)(6). Indeed, as noted **ante**, at 9, in this case the Second Circuit declined to address Mr. Zea's claim in his direct appeal that his sentence was procedurally and substantively unreasonable.

Waivers are deemed valid and enforceable if entered into voluntarily and with knowledge of the nature and consequences of the waiver, and as long as their enforcement does not work a miscarriage of justice. *See, e.g., United States v. Ready*, 82 F.3d 551, 556 (2d Cir. 1996); *see also Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (whether defendant made an "intentional relinquishment or abandonment of a known right" to be determined upon the particular facts and circumstances of each case).

Enforceable waivers are seen generally as barring claims based on grounds that arose after, as well as before, a plea agreement was signed. *See Garcia-Santos v. United States*, 273 F.3d 506, 509 (2d Cir. 2001) ("[t]here is every reason to believe the parties intended the waiver to apply to claims of error at sentencing as well as to claims relating to pre-pleading events since, for a defendant who pleads guilty, the main contested issues are ordinarily about the sentencing."); *but see*, *United States v. Attar*, 38 F.3d 727, 732 (4th Cir.1994) (permitting review of Sixth Amendment claim concerning attorney's post-plea performance despite express waiver). The defendant-petitioner shoulders the burden of demonstrating why the waiver should not be enforced.

In assessing waivers, courts must consider whether the predicate events set forth the agreement necessary to trigger the waiver have occurred. In that regard, waivers are to be construed narrowly and strictly against the government. *United States v. Ready*, 82 F.3d at 556, 559. Here, the Plea Agreement does not expressly mention claims of ineffective assistance of counsel.

Additionally, the issue of what constitutes a miscarriage-of-justice is open-ended but can include "how clear and grave an error existed, the effect of that error on the parties, and the extent to which the defendant acquiesced in the error." It can also include ineffective assistance of counsel.

In reviewing the government's proposed plea agreement with a client and advising the client regarding its terms, defense counsel is placed in the untenable position of having to render advice concerning the quality of his own representation, or waiver of future claims related thereto. Also, at the time a plea agreement is signed, counsel cannot predict conclusively in advance

17

whether or not his or her performance at sentencing will be ineffective.

Conversely, the client, too, is placed in the impossible and anomalous position of accepting the advice and representation of an attorney without any means of determining whether that advice and/or representation is effective for Sixth Amendment purposes, particularly with respect to future performance (at sentencing).

Likewise, defense counsel cannot validly advise a client about such a waiver given not only the intrinsic conflict of interest that necessarily permeates such a discussion, but also the practical impossibility of contemporaneously providing advice and representation, and simultaneously deeming it ineffective (and so advising the client).

Consequently, a defendant is functionally without counsel, contrary to the protections of the Sixth Amendment, as any plea agreement implicitly seeking waiver of his right to bring an ineffective assistance of counsel claim under 28 U.S.C. §2255 would be unenforceable.  That also renders untenable any argument by the government that a waiver of ineffective assistance claims could be subsumed within the waiver clause's broad language.

That irreconcilable tension between the Sixth Amendment right to effective assistance and plea agreement waiver provisions has also been recognized by the American Bar Association (hereinafter "ABA").  The ABA's Criminal Justice Standards for Prosecution Function, Fourth Edition, prescribe that

> a prosecutor should not suggest or require, as a condition of a disposition agreement, any waiver of post-conviction claims addressing ineffective assistance of counsel, . . . unless such claims are based on past instances of such conduct that are specifically identified in the agreement or in the transcript of proceedings that address the agreement.

18

*Id*., at Standard 3-5.8, available at

<https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEditi on.html[2]

Accordingly, the Plea Agreement herein should not be construed to include a waiver of Mr. Zea's claims of ineffective assistance of counsel, and even if it were so interpreted, such a waiver would be unenforceable.

**B.**     ***Counsel's Written and Oral Sentencing Presentations Failed to Include Any Mitigating Background or Personal History Information for Mr. Zea***

The written sentencing submission on Mr. Zea's behalf includes only cursory background and personal history information [much of it replicating what appeared in the Pre-Sentence Report (hereinafter "PSR")] consisting of perhaps one page of text followed by a single paragraph summarizing Mr. Zea's productive post-arrest activity while confined at the Metropolitan Detention Center (hereinafter "MDC").  *See* March 26, 2015, Sentencing Memo (hereinafter "Sentencing Submission"), at 6-7.[3]  Nor did the Reply Sentencing Submission (ECF Docket #

---

[2]  In fact, Attorney General Eric Holder announced October 14, 2014, that DoJ would "no longer ask criminal defendants who plead guilty to waive their right to bring future claims of ineffective assistance of counsel."  Department of Justice Press Release, "Attorney General Holder Announces New Policy to Enhance Justice Department's Commitment to Support Defendants' Right to Counsel," October 14, 2014, available at <https://www.justice.gov/opa/pr/attorney-general-holder-announces-new-policy-enhance-justice-departments-commitment-suppoet>.  The announcement was designed to harmonize national policy since certain districts did make such requests (which, as noted above, was not explicitly included in Mr. Zea's Plea Agreement).  *Id*.  Here, although the Plea Agreement was signed September 9, 2014 (the day Mr. Zea pleaded guilty), Attorney General Holder's announcement "instruct[ed] prosecutors to decline to enforce waivers that have already been signed in cases where defense counsel provided ineffective assistance resulting in prejudice or where the defendant's ineffective assistance claim raises a serious issue that a court should resolve."  *Id*.

[3]  As the PSR noted as well, Mr. Zea's detention at MDC, during which time he worked as an orderly, was free of any infractions.  PSR, at ¶ 62.  Since his sentencing and transfer to FCI

121) (hereinafter "Sentencing Reply") provide any additional information in that regard.

That was simply inadequate.  As described below, understanding and presenting the personal history of a defendant in Mr. Zea's position, and the events that could lead someone with his background – a U.S. citizen born of Catholic, Latin American parents, and raised on Long Island with an associate's degree and without a prior criminal record – to align himself with an Islamic terrorist organization overseas, and attempt to join it, is imperative to mitigation, and the exercise of the Court's discretion at sentencing.

Nor did counsel's oral presentation at sentencing elaborate in any respect on the important facets of Mr. Zea's character and background, which are instead set forth below for the Court for the first time.

**C.**      ***The Account of Mr. Zea's Change from College Student and Prospective U.S. Soldier to Willing Enabler of a Terrorist Organization Is Compelling and Mitigating***

The facts underlying Mr. Zea's personal history, ultimately leading to his prosecution and guilty plea, are in fact compelling and mitigating in nature.  Mr. Zea was a young man with ambitions entirely diametric from terrorism, yet his ability to pursue them was stymied by events and circumstances he did not control, and which diverted him from a lawful path.

Born in Long Island, on September 8, 1988, Mr. Zea is the son of a Colombian father and Guatemalan mother.  He has two half-siblings, and one full brother (who joined the U.S. Air Force Reserves).  He grew up closest to that brother and their mother.  The family lived first in

---

Hazelton, Mr. Zea has continued to be productive in his 19 months there.  He has earned certificates, as well as three credits for a college-level course.  He has taught a course twice to other inmates.  Initially, he worked in an HVAC capacity, but now works in food service.

Roosevelt, then Freeport, then Brentwood.[4]

Mr. Zea's mother was a home health aide at a retirement center;  his father worked regularly, sometimes seven days a week.  Mr. Zea was the first person in his family to be a U.S. citizen, and to obtain a college degree.  Mr. Zea's parents spoke only Spanish, so he developed that as his first language.  In elementary school, Mr. Zea was placed in English as a Second Language (hereinafter "ESL") classes through the third grade.

In middle school, Mr. Zea was bullied constantly because of his height, his glasses and because (due to his Native South American lineage) he did not have much facial or body hair.  As a result, he got into a fight with another student.  In high school, Mr. Zea played computer games often, and was vice-president of an after-school club that played board games such as Axis/Allies and Diplomacy.  He was also a member of the Science Fiction/Anime club.  Mr. Zea developed close relationships with the teacher-advisers for those clubs, but did not maintain those relationships after high school.

After graduating high school, Mr. Zea had wanted to join the U.S. Marine Corps, but his parents would not sign the paperwork permitting him to enlist (because he was under 18 years old).  His father, who had served in the Colombian military, discouraged Mr. Zea, particularly because the U.S. was engaged in two active wars at the time (2006).  Nevertheless, Mr. Zea had also been influenced by his father and uncle's idealistic and romantic musings about revolutionaries they had shared with him.

At that time, concurrent with his desire to join the U.S. military, Mr. Zea began studying

---

[4] The information in this section is culled – except for when other sources are cited – from Mr. Zea's Declaration, which is attached as Exhibit 1 to the Declaration of Joshua L. Dratel, Esq., that accompanies this Petition.

Islam, in part to learn about whom the U.S. was fighting overseas.  He became more interested, and read the entire Koran.  Mr. Zea envisioned himself using his military service to become a private contractor, perhaps for foreign governments.

Mr Zea enrolled at Dowling College in Oakdale, New York.  He majored in education, and wanted to teach history or languages.  Mr. Zea's family had limited financial means, so his father refinanced the family home in order to pay tuition.  During his first year of college, Mr. Zea considering converting to Islam.  He did not know any Muslims, but he respected the religion more than any other.

Mr. Zea earned 34 credits at Dowling over the course of an academic year, and attained a Grade Point Average of 3.16.  However, again, as with his attempted enlistment, circumstances beyond Mr. Zea's control stymied his intentions.  His family could no longer afford a private college (Dowling);  consequently, he had to withdraw, and instead enrolled at Suffolk County Community College on a scholarship to enter its HVAC (Heating, Ventilation, Air-Conditioning) program.

However, Mr. Zea did not like the HVAC program, which was for three years.  He completed half that time and then switched to a liberal arts degree program.  Mr. Zea's interest in Islam peaked when he enrolled in an Arabic class (which covered Arabic literature, Islamic philosophy, and pre-Islam philosophy).

Mr. Zea had a close relationship with the professor, who also suggested that Mr. Zea obtain his Teacher of English as a Foreign Language (hereinafter "TOEFL") certificate – which he did after college.  The professor, also a convert to Islam, in fact emigrated to Bahrain for that purpose.  As a result, Mr. Zea contemplated teaching English overseas.  One other student in that

class besides Mr. Zea converted to Islam, and another student contemplated conversion during the class.  Ultimately, Mr. Zea converted to Islam by himself after researching the process on-line.

Mr. Zea graduated from Suffolk Community and spent some time in Colombia with his father's family.  Mr. Zea informed his parents that he might want to stay in Colombia and attend medical school, but his parents wanted him to return to the U.S.[5]

Throughout this period, Mr. Zea continued his embrace of Islam.  He attended the closest Sunni mosque, in Bayshore, and observed prayers and consulted with the imam.  Mr. Zea attended other mosques, as well, and different classes at them.  He attended three mosques regularly, and knew the imams at each.

He also volunteered to assist at mosque events.  In fact, volunteering was a constant thread in Mr. Zea's life:  he donated blood, was involved in feeding the needy, and participated in fundraising for the mosque.

During this period, Mr. Zea also worked at Big Lots, a retail store that sells mostly closed out or overstocked merchandise, on the 10 p.m. to 6 a.m. shift for between one and two years.  Thus, after that night shift, he would attend his college classes at 11 a.m., then went to the mosque for prayers.  Interspersed within that time Mr. Zea had to eat meals, and sleep – getting only 4-5 hours per night.

The effects of sleep deprivation on judgment and mood have been well-studied and documented.  For example

[s]leep is a basic biological necessity for all humans, indeed for all

---

[5]  Finances were always an obstacle to Mr. Zea's ambitions, and once he converted to Islam, he could not encumber himself with loans to pay for further education (because Islam bans the charging/paying of interest).

23

> creatures on the planet.  There is some natural variability and
> flexibility in the sleep cycle, hence people can go 24 or more hours
> without sleep in the right circumstances, without any lasting harm
> other than additional 'rebound' sleep the next time they are able to
> sleep normally.  However, if a person is deprived of sleep for longer
> than that, several mental and physical problems begin to
> develop. The first signs of sleep deprivation are unpleasant feelings
> of fatigue, irritability, and difficulties concentrating.  Then come
> problems with reading and speaking clearly, poor judgment, lower
> body temperature, and a considerable increase in appetite.  If the
> deprivation continues, the worsening effects include disorientation,
> visual misperceptions, apathy, severe lethargy, and social
> withdrawal.

Kelly Bulkeley, Ph.D., "Why Sleep Deprivation Is Torture," *Psychology Today,* December 15,

2014, available at <https://www.psychologytoday.com/blog/dreaming-in-the-digital-

age/201412/why-sleep-deprivation-is-torture>.

After his graduation from Suffolk Community, Mr. Zea believed he did not have a

promising future in the U.S., and considered leaving.  He had been disillusioned with the U.S.

since learning as a 14-year of the history of U.S.-Guatemala relations, including the U.S.'s role in

deposing the democratically elected president, Jacobo Arbenz, and installing a military junta

whose brutally repressive tactics were supported by the U.S.  *See, e.g.,* Stephen Kinzer, *Bitter*

*Fruit: The Story of the American Coup in Guatemala* (David Rockefeller Center for Latin

American Studies:  1982/2005 [revised edition]).

Of course, after the various avenues – including the U.S. military and further higher

education – that Mr. Zea had chosen were no longer available, that disillusionment ultimately

ripened into the offense conduct for which Mr. Zea pleaded guilty, although with respect to his

financing Justin Kaliebe's journey to Yemen, Mr. Zea  declined to provide the funds initially

despite requests from Mr. Kaliebe and the Confidential Informant before capitulating to their

24

request.

The sentencing submission also failed to describe the nature of Mr. Zea's initial relationship with Mr. Kaliebe – that he brought Mr. Kaliebe to his home because of Mr. Kaliebe's underprivileged status.  Indeed, it was the PSR, at ¶ 59, that reported that Mr. Zea's family stated that Mr. Zea "provided co-defendant Justin Kaliebe with food and clothing because Mr. Kaliebe claimed to have no one who cared for him."

Mr. Zea's personal history must also be viewed in the context of the information provided **post**, in POINT II, with respect to the sophisticated and effective on-line recruitment methods employed by terrorist organization such as *Al Qaeda* in the Arabian Peninsula (hereinafter "AQAP") – including the extraordinarily effective lectures by Anwar al-Awlaki, readily available on-line (and which constitute a common thread in many of these types of cases), that targeted and influenced young Muslims seeking an identity in the world, and guilt-tripped them about their comfortable Western surroundings compared to Muslims suffering in other parts of the world – and their impact on an individual as ripe as Mr. Zea for its messaging.[6]

---

[6]  As a commentator has remarked about Mr. al-Awlaki,

> [b]ecause of his command of English, his excellent rhetorical skills and his ubiquity online, al Awlaki was arguably the most important inspirational figure to a small but growing new breed of Internet savvy disaffected young adults in the North America and Britain. Many, including Homeland Committee Chair Congressman Peter King, regarded him as more of a threat in recent years than even [Osama] bin Laden himself, due to his recruitment of Western youth.

Brian Levin, J.D., "Anwar Al-Awlaki, American Internet Terrorist Pioneer and Plotter Killed In Yemen," *Huff Post*, available at <https://www.huffingtonpost.com/brian-levin-jd/anwar-al-awalki-american-_b_988695.html>.

The PSR, at ¶ 59, noted that Mr. Zea's family reported that he "is a very vulnerable and gullible person, who is not 'street smart[,]'" and "had difficulty in refusing requests from those purporting to need his help . . ."  Yet neither the written sentencing submission nor the oral presentation at sentencing expanded on that important aspect of Mr. Zea's personality.

Coupled with the neuroscientific scholarship (discussed **post**, at 31-33) with respect to the poor decision-making exercised by adolescents and young adults whose emotional maturity continues to develop into their mid-to-late 20's – Mr. Zea was a teenager when he first became interested in Islam, and was 22 at the time of his initial offense conduct – and the persons and events influencing Mr. Zea at the time, a very different portrayal of Mr. Zea – one that does not warrant the maximum sentence available – emerges.

**D.**     ***The Court Should Remedy Counsel's Ineffective Assistance by Re-sentencing Mr. Zea***

It is respectfully submitted that the inadequacy of both the written sentencing submission and oral  presentation prejudiced Mr. Zea materially at sentencing.  The flaws were not merely in advocacy, but in the failure to present essential *facts* about Mr. Zea, and the context of his offense conduct.

As a result, the Court was presented a one-sided portrayal of Mr. Zea, dominated by the offense conduct alone, and never saw in writing or heard at sentencing the underlying facts that could reconcile Mr. Zea's personal history, and possibilities for a productive future, with that illegality – how a fundamentally and previously good kid could do such a bad, aberrant thing.

**POINT II**

**MR. ZEA'S COUNSEL WAS INEFFECTIVE AT
SENTENCING BECAUSE HE FAILED TO EXPLOIT
CERTAIN RESOURCES THAT ARE COMMONLY
USED IN SENTENCING MITIGATION FOR
DEFENDANTS WHO PLEAD GUILTY TO
FEDERAL TERRORISM-RELATED OFFENSES**

Defending cases involving charges of terrorism presents unusual and daunting challenges.

Experience in ordinary cases does not necessarily translate to proficiency in terrorism cases unless

counsel avails himself of the resources that can help overcome the special difficulties encountered

in terrorism cases.

As a forthcoming article in MACDL VI (the publication of the Minnesota Association of

Criminal Defense Lawyers) that "focus[es] on sentencing and mitigation issues[,]" points out,

defense counsel are all familiar with "the mantra that 'death is different.'"  JaneAnne Murray and

Jean Brandl, "Terrorism is Different:  Experts and Terrorism Representations," MACDL VI

(forthcoming Winter 2017) (hereinafter "*Terrorism is Different*"), at 2, available at

<http://ssrn.com/abstract=3078903>.

However, as the authors elaborate, "terrorism, it turns out, is different too[]" because

> [t]hese cases are complicated by multiple factors that make them
> especially challenging for defense lawyers – including the complex
> political, historical and cultural context, the often troubled
> backgrounds and likely youth of the accused, the long sentences
> they encompass, and the polarizing public attitudes they generate
> from, alternately, fear and perceptions of discrimination.

*Id*., at 2.

Yet here, Mr. Zea's counsel confided to him that counsel did not have experience in that

type of case, although he assured Mr. Zea that it was not an impediment to his competent

27

representation.  Nevertheless, it certainly did act as an insurmountable obstacle to rendering Mr.

Zea effective assistance of counsel consistent with the standards demanded by the Sixth

Amendment.

As John Horgan, Ph.D. (in applied psychology), Distinguished University Professor at the

Global Studies Institute and Department of Pscyhology at Georgia State University, and a frequent

author on the subject, has written, "[t]he journey into and out of terrorism is as personal as it is

complex."  John Horgan, Ph.D., *What Makes a Terrorist Stop Being a Terrorist?*, 1 J. for De-

radicalization 1, 4 (2014).

As stated in *Terrorism is Different*, in terrorism cases, "[a]n effective defense strategy

must therefore incorporate a range of scholarly and professional expertise."  *Id*., at 2.[7]  Among the

issues that occur with some frequency in terrorism cases – particularly with respect to young

Muslim males in the West – is on-line recruitment by terrorist organizations.  Nevertheless, as

*Terrorism is Different* advises, "there is a wealth of scholarly and expert research to inform the

defense mission, particularly in the context of developing mitigating factors for sentencing . . ."

*Id*., at 12.

More recently the focus has been on ISIS, but analogous to its predecessors such as *al

Qaeda* and its various regional franchises (such as AQAP, the FTO in this case), ISIS's

"recruitment strategy is not unique to [ISIS], its forebear Al-Qaida, or terrorist groups in general.

---

[7]  *Terrorism is Different*, at 2 n.15, includes an inexhaustive list of valuable defense
resources, available on the internet, for terrorism cases:

    https://www.aclu.org/issues/national-security
    https://www.nacdl.org/nationalsecurity
    http://www.centeronnationalsecurity.org)

In fact, Al-Qaida leader Ayman Al-Zawahiri claimed half of his organization's battle was 'taking place in the battlefield of the media.'" *Id*, at 4-5, *quoting* Ayman Al-Zawahiri, "Letter from Al-Zawahiri to Al-Zarqawi," *Global Security*, October 11, 2005, available at <http://www.globalsecurity.org/security/library/report/2005/zawahiri-zarqawi-letter_9jul2005.htm>.[8]

Even government authorities recognize the powerful lure of social media and other on-line recruitment on alienated young males. As President Obama commented at a symposium dedicated to developing programs to combat violent extremism ("CVE"), terrorist organizations have targeted Muslim youth worldwide "who may be disillusioned or wrestling with their identity." *See* President Barack Obama, *Remarks in Closing the CVE Summit*, February 18, 2015, available at https://obamawhitehouse.archives.gov/the-press-office/2015/02/18/remarks-president-closing-summit-countering-violent-extremism (noting link between economic grievances and terror recruitment).

In that context, reference to social science literature and research is imperative – just as it is in capital cases – in presenting mitigation on behalf of a young Muslim male charged with a terrorism-related offense. As *Terrorism is Different* explains, "[s]ocial psychologist Erik Erikson coined the term 'identity crisis' in his landmark work 'Childhood and Society,' which explained the social significance of childhood and his conclusion that young people face identity confusion from the age of 12-18 as they try to become adults." *Terrorism is Different*, at 7-8, *citing and quoting* Erik H. Erikson, *Childhood and Society*, (W.W. Norton: 1993).

_____

[8] In *Terrorism is Different* ISIS is denominated as ISIL –the  Islamic State for Iraq and the Levant – but for purposes of consistency this Petition will refer to the organization as ISIS (the Islamic State in Iraq and Syria).

Elaborating, *Terrorism is Different* adds that

> [f]or immigrant and minority youth, this identity
> crisis is more pronounced, because "part of th[eir]
> development of identity involves an 'intensified
> exploration of the meaning of one's ethnicity' and
> the 'special task to negotiate a balance between two
> value systems:  that of their own group and that of
> the majority.'"

*Terrorism is Different*, at 8, *citing and quoting* Lidwien Kapteijns and Abukar Arman, *Educating*

*Immigrant Youth in the United States: An Exploration of the Somali Case*, 4 Bildhaan: An

International Journal of Somali Studies 18, 24 (2008) (hereinafter "*An Exploration of the Somali*

*Case*").

In turn, certain variables can increase the alienation and confusion associated with identity

issues:

> [i]f the process of discovering identity is "highly conflicted due to
> cultural friction with parents or discrimination by the mainstream, it
> can lead to a host of problems, among them stress, low self-esteem,
> anger and oppositional behavior, 'ethnic identity crisis,' 'identity
> deficit' (when a youth no longer knows what to do), or
> 'marginalization' (the rejection of both domains.)"

*Id*.

In addition, the conflict "is exacerbated by experiences of discrimination, perceived or

actual, particularly race discrimination.  Research shows that experiences of injustice are a strong

cause of 'nonnormative actions,' which can be remedied when 'paths to individual mobility are

seen to be open.'"  *Terrorism is Different*, at 8, *citing and quoting* Fathali Moghaddam, *The*

*Staircase to Terrorism: A Psychological Exploration*, 60 American Psychologist 161, 163-4

(2005).

*Terrorism is Different* cites another factor that facilitates recruitment of young Muslim men in the West to the cause of an Islamic FTO: "their relative immaturity and their susceptibility to powerful peer-group messaging." *Terrorism is Different*, at 8. As the article notes, "[d]ecades of research by developmental psychologists and neuroscientists on the development of the adolescent brain, . . . have highlighted adolescents' impulsivity, vulnerability to peer pressure, and transient identity." *Id.*, *citing* Barry C. Feld et. al*., Adolescent Competence and Culpability: Implications of Neuroscience for Juvenile Justice Administration*, in Stephen Morse & Adina Roskies, eds., *A Primer on Criminal Law and Neuroscience* (New York: Oxford University Press, 2013), at 183 ("*Adolescent Culpability*"); David O. Brink, *Immaturity, Normative Competence, and Juvenile Transfer: How (Not) to Punish Minors for Major Crimes*, 82 Tex. L. Rev. 1555 (2004); Elizabeth S. Scott & Laurence Steinberg, *Blaming Youth*, 81 Tex. L. Rev. 799, 811 (2003) ("*Blaming Youth*").

Nor does that "immaturity gap" close until individuals reach their mid-20's. *See Adolescent Culpability* at 187 ("[t]he 'immaturity gap' represents the cleavage between adolescents' intellectual maturity – which reaches near-adult levels by age 16 – and psycho-social maturity of judgment, which may not emerge fully for another decade"); Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 Developmental Review 76, 81 (2008) ("[t]he differing timetables of these changes—the increase in reward-seeking, which occurs early and is relatively abrupt, and the increase in self-regulatory competence, which occurs gradually and is not complete until the mid-20s, makes mid-adolescence a time of heightened vulnerability to risky and reckless behavior").

Moreover, "[a] wealth of research establishes a disconnect in adolescents between their

intellectual ability and  their maturity of judgment.  While they can distinguish between right and

wrong, their ability to exercise good judgment and self-control (*i.e.*, thinking ahead, delaying

gratification, estimating risk, restraining impulses, etc.) is limited, and is not fully developed until

their early to mid-twenties." *Terrorism is Different*, at 9, *citing Adolescent Culpability* at 187

(collecting research);  *Blaming Youth* at 811-19.

These findings formed the foundation of a series of Supreme Court cases, commencing in

2005, that adopted them, and ultimately proscribed the death penalty, and subsequently even life

imprisonment, for minors.  *See Miller v. Alabama*, 567 U.S. 460, 470-71 (2012); *Graham v.

Florida*, 560 U.S. 48, 76 (2010);  *Roper v. Simmons*, 543 U.S. 551, 569 (2005).

They also are not grounded simply social science, as "[n]euroscientific research

corroborates the observational findings of social psychologists." *Terrorism is Different*, at 9.  In

fact, "[t]he immature judgment and impaired self-control of adolescents have been associated with

neurobiological differences between adolescent and adult brains." *Id.*, *citing Adolescent

Culpability* at 193-94 (noting the "widespread neurobiological differences in the structural and

functional development of prefrontal cortical and subcortical limbic structures in adolescents

compared to adults," which "may contribute to the poor judgment, reduced self-control, risk

taking and heightened reward-responsiveness characteristic of this developmental period").[9]

The time horizon of brain development has also been confirmed by neuroscience.  For

---

[9]  Also, "[n]eural imaging studies have shown that, in comparison to adults, the
adolescent brain overreacts to social stimuli while it has a reduced mechanism for processing
these same stimuli." *Terrorism is Different*, *citing Adolescent Culpability*, at 193;  Todd A. Hare
et. al., *Biological Substrates of Emotional Reactivity and Regulation in Adolescence During an
Emotional Go-Nogo Task,* 63 Biological Psychiatry 927, 932 (2008);  Amanda E. Guyer et. al.
*Amygdala and Ventrolateral Prefrontal Cortex Function During Anticipated Peer Evaluation in
Pediatric Social Anxiety*, 65 Arch. Gen. Psychiatry 1303 (2008).

example, studies of brain development have determined conclusively that the brain does not

achieve full capacity for psychosocial maturity until at least age 19 and is significantly less mature

than individuals in their mid-20's.   E. Cauffman & Laurence Steinberg, "(Im)Maturity of

Judgement in a Adolescence:  Why Adolescents May Be Less Culpable Than Adults," 18

*Behavioral Sciences & Law* 741, 756 (2000);  Steinberg, Cauffman, Woolard, Graham & Banich,

"Are Adolescent Less Mature Than Adults? Minors Access to Abortion, the Juvenile Death

Penalty, and the Alleged ABA 'Flip-Flop,'" *American Psychologist*, Vol. 64, No. 7, pp. 583-594

(2009).

A 2013 law review article reports that

> [s]cientists have found clear evidence that the brain continues to
> mature through adolescence and *into the early twenties*, with large-
> scale structural change taking place during this period in the frontal
> lobes, most importantly within the prefrontal cortex, and in the
> connections between the prefrontal cortex and other brain regions.

David Pimentel, "The Widening Maturity Gap:  Trying and Punishing Juveniles as Adults in an

Era of Extended Adolescence ," Texas Tech Law Review, Vol. 46, 2013, at 84.[10]

Thus, according to the article's author,

> [n]euroscience tells us that we should expect some irrational,
> emotion-driven behavior from emerging adults, those aged eighteen
> to twenty-five, and that it is not until their late twenties that it is
> reasonable to expect them to have the brain development necessary
> to behave like fully rational adults.

*Id*. (footnote omitted).

---

[10]  The article adds that the "prefrontal cortex is central to what psychologists call
'executive functions,' advanced thinking processes that are employed in planning ahead and
controlling impulses, and in weighing the costs and benefits of decisions before acting."  *Id*., at
84 (footnote omitted).

These vulnerabilities identified by social science and neuroscience are exploited by terrorist organizations, *see Terrorism is Different*, at 10, and Mr. Zea is precisely within that target demographic.[11]  As the reports issued by the Fordham Center on National Security establish, the average age of defendants in ISIS cases is 27, but most are 25 or younger.  *See* Karen J. Greenberg, *The American Exception:  Terrorism Prosecutions in the United States – The ISIS Cases*, Fordham Law School Center on National Security, September 13, 2017, available at <https://docs.google.com/viewer?url=https%3A%2F%2Fstatic1.squarespace.com%2Fstatic%2F5 5dc76f7e4b013c872183fea%2Ft%2F59cf980ae45a7c855f673bca%2F1506777101200%2FThe%2 BAmerican%2BException%2B9-17.pdf&pdf=true>, at 11.

In addition, they are "[o]ften drawn to ISIL through social media, [and] many were experiencing alienation and identity crises at the time of their offense, and could be characterized as 'seekers' of religious, political or social attachment."  *Terrorism is Different*, at 1, *citing* Karen Greenberg, *Case by Case: ISIS Prosecutions in the United States*, Fordham Law School Center on National Security, July 6, 2016, available at <https://docs.google.com/viewer?url=https%3A%2F%2Fstatic1.squarespace.com%2Fstatic%2F5 5dc76f7e4b013c872183fea%2Ft%2F577c5b43197aea832bd486c0%2F1467767622315%2FISIS %2BReport%2B-%2BCase%2Bby%2BCase%2B-%2BJuly2016.pdf&pdf=true>; at 3.

As detailed **post**, at 38-41, the Fordham Center on National Security (and its predecessor, the New York University Law School Center on Law and Security) have regularly for more than a

---

[11]  *See also* Peter Bergen, *United States of Jihad:  Who Are America's Homegrown Terrorists, and How Do We Stop Them?*, (Crown:  2016);  Dina Temple-Raston, "He Wanted *Jihad*.  He Got Foucault," *New York Magazine*, November 26, 2017, available at <http://nymag.com/daily/intelligencer/2017/11/abdullahi-yusuf-isis-syria.html>.

decade published statistical digests of U.S. federal terrorism cases that provide defense counsel with an invaluable resource with respect to trends in charging, dispositions and sentencing, and common features among defendants.

A number of these factors coincide with this case.  *See, e.g.*, PSR, at ¶ 7 (AQAP "adept at using technology and the Internet to popularize its message");  *id*., at ¶ 22 & Sentencing Transcript, at 8 (noting that Mr. Zea read *al Qaeda*'s *Inspire* magazine and had it on his computer);  **ante**, at 25 & n.6 (discussing the influence of Anwar al-Awlaki).

Yet not only were these important factors, and their relationship to the social science and neuroscience, and the larger phenomenon of attraction to terrorist organizations, missing from Mr. Zea's counsel's sentencing submission and presentation, but also absent was the prospect for future maturation and reform.

As *Terrorism is Different* points out, "[c]onsistent with data on adolescent criminal behavior, young jihadi recruits are amenable to abandoning violent extremism, and to programs and religious intervention developed to achieve that objective."  *Terrorism is Different*, at 10, *citing* Horgan, *What Makes a Terrorist Stop Being a Terrorist?*,at 2;  Mubin Shaikh, *Countering Violent Extremism Online: An Anecdotal Case Study Related to Engaging ISIS Members and Sympathizers on Twitter,* 98 Soundings 478, 485-86 (2015).

All of this information would have established for the Court that Mr. Zea represented neither an isolated case nor an irredeemable defendant, but instead shared features common among many defendants, similarly situated in terms of offense conduct and Guidelines range, who have received significantly lower sentences.  It is respectfully submitted that such information would have made a difference at sentencing.

## POINT III

**MR. ZEA'S COUNSEL WAS INEFFECTIVE
AT SENTENCING BECAUSE HE FAILED TO
SEEK AN ADJOURNMENT IN ORDER TO VERIFY
THE DESCRIPTION OF OTHER CASES FOR
COMPARATIVE PURPOSES, AND/OR FAILED TO
CITE INCONTROVERTIBLE STATISTICAL
<u>INFORMATION TO SUPPORT MR. ZEA'S POSITION</u>**

At sentencing, the Court was dubious whether the cases Mr. Zea's counsel cited as

comparisons in order to justify a sentence below the maximum were, in fact, comparable.  The

basis for the Court's skepticism was the source of the information – the U.S. Department of

Justice (hereinafter "DoJ") press releases issued after guilty pleas and/or sentencings:

> [y]ou are actually relying upon, just so it's clear for the record,
> although it is here from your submissions, that you are relying upon
> press releases from the Department of Justice.  That is the entirety
> of your submissions on this issue.  Am I correct?

Transcript, April 20, 2015  (Dkt#139) (hereinafter "Sentencing Transcript"), at 12.

Mr. Zea's counsel responded,

> [n]ot the entirety.  We also cite some cases and we cited the District
> Court decision in *United States vs Warsame*, where a judge was
> faced with a defendant convicted of the same crime, the same
> offense as this defendant.  That District Court judge conducted a
> review of sentences handed down from the courts, the federal courts
> for other cases.  He looked at a number of cases.  And that judge –
> in that case you have a defendant whose conduct was much more
> culpable than Mr. Zea . . ."

*Id*., at 12-13.

Yet the Court was unpersuaded as to the reliability of the information for purposes of

determining whether a longer sentence for Mr. Zea constituted an unwarranted disparity [and

36

therefore contrary to the direction of 18 U.S.C. §3553(a)(6)].[12]  *See* Sentencing Transcript, at 13-14.

At that point, Mr. Zea's counsel should have requested an adjournment in order to permit counsel to provide the Court with the verification it needed with respect to the particulars of each case upon which the Court could rely in satisfying itself that similarly situated defendants had received sentences lower – and in many instances significantly lower – than the maximum available in Mr. Zea's case.

Indeed, the list of comparable cases comprised the majority of the written sentencing submission on Mr. Zea's behalf.  *See* Sentencing Submission, at 22-55.  Thus, it was incumbent upon counsel to support those examples with sufficiently reliable materials.  Having been confronted with the Court's position, counsel was ineffective in not seeking more time to establish the veracity of the information and validity of the point being made:  that a 25-year sentence for Mr. Zea was grossly disproportionate in light of other sentences imposed on similarly situated defendants for similar conduct.  *See, e.g., Hodgson v. Warren*, 622 F.3d 591, 599–600 (6th Cir. 2010) (counsel failing to seek an adjournment to secure witness's testimony could constitute ineffective assistance).  *See also McWilliams v. Dunn*, ___ U.S. ___,137 S. Ct. 1790, 1799 (2017) (court erred, *inter alia*, in not granting defense counsel an adjournment to allow for consultation with an expert to counter the conclusions of the court's appointed mental health expert).

Alternatively, Mr. Zea's counsel should have amplified its submission by including reference to incontrovertible statistical information compiled by independent academic

---

[12]  The sentencing factor set forth in §3553(a)(6) directs a sentencing court to be mindful of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"

institutions cataloging *all* of the terrorism and national security-related federal prosecutions in the United States since September 11, 2001.

For example, New York University's Center on Law and Security, subsequently reconstituted as the Center on National Security at Fordham University Law School (hereinafter "the Center"), has periodically for a decade published comprehensive statistical treatments of post-September 11th terrorism prosecutions in the U.S.  The analysis in those reports would have dispositively established for the Court that a 25-year sentence for Mr. Zea was disproportionate, and created an unwarranted sentencing disparity in contravention of §3553(a)(6).

The statistics establish that a sentence of even 20 years' imprisonment well exceeded the average for terrorism-related charges and cases.  The Center's three most recent versions of its "Terrorist Trial Report Card," which examined terrorism-related prosecutions and their results and were published in 2006, 2010, and 2011, each analyzed the data somewhat differently, but provided illuminating figures.  The September 11, 2008, edition of that Terrorist Trial Report Card, based on the sentences imposed on the 370 defendants convicted of terrorism offenses (and sentenced) between September 11, 2001, and September 2008 reported that the average sentence for all defendants convicted of terrorism charges was approximately twelve years and eight months (12.67 years),[13] and the average sentence for convictions for material support for terrorism were 14.75 years (18 U.S.C. §2339A) and 11.92 years (§2339B).  Even for violations of 18 U.S.C. §2332 (murder of U.S. nationals outside the U.S., a potential capital offense), the average

---

[13]  *Terrorist Trial Report Card, September 11, 2008*, available at <http://www.lawandsecurity.org/Portals/0/documents/03_Sept08TTRCFinal1.pdf>.

sentence was 26 years.[14]

The 2010 version of the Terrorist Trial Report Card, which covered U.S. federal prosecutions between September 11, 2001, and September 11, 2009, provided slightly different nomenclature:  (i)  the "average sentence for persons convicted of terrorism" was 16 years (191.9 months);  (ii)  the "average sentence for persons charged with terrorism" was 19.7 years (236 months);  (iii)  the "average sentence for persons charged with national security violations but not terrorism" was 10.4 years (124.5 months);  and (iv)  the "average sentence for persons convicted of national security violations and not charged with terrorism" was 7.5 years (90.3 months).[15]

The September 2011 edition of the Terrorist Trial Report Card, covering September 11, 2001, through September 11, 2011, again alters the characterization, and provides the following average sentences graphically (and not in precise numbers):

(i)      for "Terror or National Security Top Charge":  between 10 and 15 years;

(ii)     for "Material Support Top Charge":  also between 10 and 15 years, but less than for "Terror or National Security Top Charge;"

(iii)    for "Material Support Lesser Charge":  slightly less than 15 years;

(iv)    for "National Security Charge Conviction":  slightly more than 15 years;

(v)     for "Terror Charge Conviction":  also slightly more than 15 years, but slightly

---

[14]  *Id.*

[15]  *Terrorism Trial Report Card, September 11, 2001-September 11, 2009* (published January 2010), at 13, available at <http://www.lawandsecurity.org/Portals/0/documents/01_TTRC2010Final1.pdf>.  *See also Terrorist Trial Report Card: U.S. Edition*, Appendix B at 10, New York University School of Law Center on Law and Security, available at <http://www.lawandsecurity.org/publications/TTRCComplete.pdf>.

more than for "National Security Charge Conviction;" and

(vi)    for "Terror and National Security Charge Conviction":  25 years.[16]

In 2013, the Center also published "By the Numbers – U.S. Prosecutions of Jihadist Terror Crimes, 2001-2013,"[17] digesting 368 cases, 297 convictions (209 by guilty plea and 89 after trial). The average sentence for all cases was 181 months (15 years, one month), and 201 months (16 years, 9 months) for convictions pursuant to 18 U.S.C. §2339A, and 199 months (16 years, 7 months) for convictions pursuant to 18 U.S.C. §2339B – the material support offense to which Mr. Zea pleaded guilty.[18]

---

[16] *Terrorism Trial Report Card, September 11, 2001-September 11, 2011*, at 7, available at <http://www.lawandsecurity.org/Portals/0/Documents/TTRC%20Ten%20Year%20Issue.pdf>.

[17] That 2013 analysis is available at <https://static1.squarespace.com/static/55dc76f7e4b013c872183fea/t/56b88ef1356fb0ff251aa15a/1454935794120/JihadistFactSheet2001-13.pdf>.

[18] The Center has continued to publish periodic reports on terrorism prosecutions, particularly those involving persons charged with offenses connected to the Islamic State (hereinafter "ISIS"), which case also have elements similar to those present here, *i.e.*, individuals traveling abroad for the purpose of joining an FTO, or financing such travel by other). *See, e.g., The American Exception:  Terrorism Prosecutions in the United States – The ISIS Cases*, September 13, 2017, available at <https://docs.google.com/viewer?url=https%3A%2F%2Fstatic1.squarespace.com%2Fstatic%2F55dc76f7e4b013c872183fea%2Ft%2F59cf980ae45a7c855f673bca%2F1506777101200%2FThe%2BAmerican%2BException%2B9-17.pdf&pdf=true>; *Case by Case: ISIS Prosecutions in the United States*, July 6, 2016, available at <https://docs.google.com/viewer?url=https%3A%2F%2Fstatic1.squarespace.com%2Fstatic%2F55dc76f7e4b013c872183fea%2Ft%2F577c5b43197aea832bd486c0%2F1467767622315%2FISIS%2BReport%2B-%2BCase%2Bby%2BCase%2B-%2BJuly2016.pdf&pdf=true>; *May 2017 Update: ISIS in the U.S.,* May 8, 2017, available at <https://docs.google.com/viewer?url=https%3A%2F%2Fstatic1.squarespace.com%2Fstatic%2F55dc76f7e4b013c872183fea%2Ft%2F591095c89de4bb0a23961069%2F1494259145920%2FISIS%2BCase%2BUpdate%2B5-8-2017.pdf&pdf=true>; *Statistical Overview*, February 24, 2017, available at <https://docs.google.com/viewer?url=https%3A%2F%2Fstatic1.squarespace.com%2Fstatic%2F55dc76f7e4b013c872183fea%2Ft%2F58b0a7145016e199ea7677c3%2F1487972117194%2FS-5

Moreover, the Sentencing Commission issues quarterly reports detailing sentencing statistics for all federal cases.  The most recently released report at the time of Mr. Zea's sentencing would have been for Fiscal Year 2014 (from October 1, 2013 through September 30, 2014), entitled *U.S. Sentencing Commission Final Data Report, Fiscal Year 2014* (hereinafter "*Final Data Report FY 2014*"), available at <https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2014_Quarterly_Report_Final.pdf>, released April 20, 2015.

Table 19 of the *Final Data Report 2014*, at 31, entitled "Sentence Length In Each Primary Offense Category," provides the mean and median sentence in each offense category for all of Fiscal Year 2014.  Terrorism offenses are not delineated separately.  However, Mr. Zea's 300-month sentence was longer than either the mean or median for *any* offense category by a considerable margin  – including murder (mean:  273 months;  median 240 months), kidnaping/hostage taking (mean:  201 months;  mean 168 months);  sexual abuse (mean:  134 months; median:  120 months), child pornography (mean:  137 months;  median:  97 months), and manslaughter (mean:  54 months;  median:  37 months).

These collective statistics demonstrate that a sentence in this case considerably below 20 years would certainly have been "sufficient, but not greater than necessary," to achieve 18 U.S.C. §3553(a)(2)'s stated goals of sentencing, and would, as required by 18 U.S.C. §3553(a)(6), have

---

%2BISIS_AQ%2BOverview.pdf&pdf=true>;  *By the Numbers: ISIS Cases in the United States*, June 22, 2015, available at <https://static1.squarespace.com/static/55dc76f7e4b013c872183fea/t/56b3aae8f8baf3bfd460ecb5/1454615277175/ISIS+Cases+in+the+U.S.+-+June+2015.pdf>.

avoided creating an unwarranted sentencing disparity between Mr. Zea and other defendants whose offense conduct was either equivalent or demonstrably worse.

Consequently, Mr. Zea's counsel failed to provide Mr. Zea effective assistance of counsel as guaranteed by the Sixth Amendment by not requesting an adjournment to supplement the record with more reliable information regarding the cases he used for purposes of comparison, and by failing to present the pre-existing statistical analyses to the Court for consideration.

### POINT IV

**MR. ZEA'S COUNSEL WAS INEFFECTIVE AT SENTENCING BECAUSE HE RELIED UPON A FUTILE AND FRIVOLOUS ARGUMENT WHILE IGNORING AN EFFECTIVE ALTERNATIVE POSITION**

Mr. Zea's counsel also failed to provide effective assistance because counsel relied upon an argument – that the Sentencing Guidelines' 12-point terrorism enhancement, codified in §3A1.4 – that was legally and factually futile and frivolous.[19]  In so doing, counsel incurred the Court's displeasure, injured counsel's credibility, and impaired counsel's ability to advocate effectively for a prison sentence for Mr. Zea below the maximum available.

Conversely, Mr. Zea's counsel did *not* offer a corresponding alternative ground for mitigation that has been standard, and effective (both implicitly by results, and explicitly by sentencing courts' remarks) in terrorism-related cases.  That omission, too, constituted ineffective assistance that denied Mr. Zea his Sixth Amendment rights.

---

[19]  *See* Sentencing Submission, at 16-20;  Sentencing Reply, at 2-4;  Sentencing Transcript, at 3.

**A.**     ***Mr. Zea's Counsel Should Not Have Objected to the Terrorism Enhancement***

The applicability of the terrorism enhancement has been a foregone conclusion in (at least) the Second Circuit since its opinion in *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010).  *See also United States v. Arnaout*, 431 F.3d 994 (7th Cir 2005).  Thus, Mr. Zea's counsel should not have challenged the enhancement pursuant to §3A1.4 – and certainly not without acknowledging the controlling nature of *Awan*.

In fact, as the prosecutor in this case responded at sentencing, "Here this isn't even remotely a close question, your Honor.  There is no dispute that AQAP is a terrorist organization.  This defendant allocuted that he intended to join this organization."  Sentencing Transcript, at 7.

Yet, in making and persisting with his objection to the enhancement, Mr. Zea's counsel invited criticism, if not incredulousness, from the Court.  *Id*., at 5-6.  Eventually, the Court opined that "frankly I think it is somewhat disingenuous to state that someone who supports, apparently in every [way], a particular group that has a particular purpose, is not interested in furthering those goals and does not have an intent to do so."  *Id*., at 10.

**B.**     ***Mr. Zea's Counsel Should Instead Have Advanced the Position That the Terrorism Enhancement Always and Automatically Increases a Defendant's Guidelines Range Regardless of the Nature of His Conduct***

Instead of challenging the terrorism enhancement as a matter of calculating Mr. Zea's applicable Guidelines level, Mr. Zea's counsel should have advocated for the Court to ameliorate the Draconian impact of the enhancement – a 12-level increase in the offense level *plus* movement of the defendant (in this, someone without *any* prior criminal record) to Criminal History Category VI – by either a downward departure or through application of the §3553(a) sentencing factors.

Such a position has proved successful in other cases in convincing sentencing courts that the enhancement's effect on a defendant's Guidelines level – both vertically with respect to offense level, and horizontally with respect to the Criminal History Category – was too harsh, and required remedial action through either a downward departure or, more commonly, the discretion vested in the court via the §3553(a) sentencing factors.

The rationale that Mr. Zea's counsel should have pursued follows.

**1.      *The Automatic Application of the Guidelines' Terrorism Enhancement Should Be Remedied By Resort to the §3553(a) Sentencing Factors***

The mere applicability of §3A1.4 does not end the analysis or dictate the sentence, as the other §3553(a) sentencing factors, and the parsimony clause,[20] must be considered in counterpoint to the drastic impact of §3A1.4.

In that context, the Second Circuit's decision in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) in which the Court addressed essentially automatic but severe Guidelines enhancements in child pornography cases that placed Guidelines ranges at or near the statutory maximum(s) is particularly pertinent here, too.  *See also United States v. Henderson*, 649 F.3d 955, 963 & n.4 (9th Cir. 2011) (noting that "similar to the crack cocaine Guidelines, district courts may vary from the child pornography Guidelines, §2G2.2, based on policy disagreement with them[,]" and adding that "in so holding we join several of our sister circuits" including the Second Circuit), *quoting Dorvee*, 616 F.3d at 184-86 (for the proposition that §2G2.2, which imposes

---

[20]  In *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010), in discussing the "parsimony clause," the Second Circuit reiterated that "[p]lainly, if a district court were explicitly to conclude that two sentences equally served the statutory purpose of §3553, it could not . . . impose the higher."  616 F.3d at 184, *quoting United States v. Ministro-Tapia,* 470 F.3d 137, 142 (2d Cir. 2006).

enhancements relating to possession of child pornography, is "fundamentally different" from other Guidelines and, unless it is "applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires").

In *Dorvee* the Second Circuit noted the high frequency with which §2G2.2's component enhancements applied in child pornography cases ("to the vast majority of defendants sentenced under §2G2.2"), "resulting in a typical total offense level of 35[,]" which in turn led to Guidelines ranges at or beyond the statutory maximum even in routine cases. 616 F.3d at 186. In the terrorism context, too, the scope of the terrorism enhancement in §3A1.4, is so broad that it invariably applies in every terrorism case. *See, e.g., United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009).

Both the Second Circuit, in *Dorvee*, and the Ninth Circuit, in *Henderson*, explained that §2G2.2 is different from most Guidelines in that it is not based on empirical data. *See Dorvee*, 616 F.3d at 186. *See also Henderson*, 649 F.3d at 962- 963 ("[a]s the history and the Commission's own reports and assessments of these Guidelines demonstrate, the child pornography Guidelines are, to a large extent, not the result of the Commission's 'exercise of its characteristic institutional role,' which requires that it base its determinations on 'empirical data and national experience,' but of frequent mandatory minimum legislation and specific congressional directives to the Commission to amend the Guidelines"), *quoting Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (discussing the same defect with regard to the crack-cocaine Guidelines at issue in that case).

The same is true with respect to §3A1.4 as well: it represents merely a point in space chosen arbitrarily, and is not the result of the Sentencing Commission's core function, *i.e.,*

assigning Guidelines levels that conform with conclusions based on data compiled from a statistically significant number of cases.

In *Dorvee*, the Second Circuit further examined the extent to which a sentencing court owes deference to the Guidelines when a particular enhancement is not the product of empirical evidence, explaining that the ordinary

> deference to the Guidelines is not absolute or even controlling; rather, like our review of many agency determinations, "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 [] (1944); *see Kimbrough,* 552 U.S. at 109 [] (citing the crack cocaine Guidelines as an example of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role").

616 F.3d at 188.

In evaluating §2G2.2 in *Dorvee*, the Court identified specific problems with such enhancements. For example,

> [a]n ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction.

*Id.*, at 186.

As a result, the Court in *Dorvee* recognized that under such circumstances

> adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories.

*Id.*, at 187.

46

Confronted with that situation in *Dorvee*, the Second Circuit concluded that "[t]his result is fundamentally incompatible with § 3553(a)[,]" because "[b]y concentrating all offenders at or near the statutory maximum, §2G2.2 eviscerates the fundamental statutory requirement in §3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant[.]'" *Id*.

In language particularly relevant here with respect to Mr. Zea, the Court in *Dorvee* added that mechanical application of such Guidelines enhancements

> violates the principle, reinforced in *Gall,* that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct. *See Gall,* 552 U.S. at 55 [] (affirming a sentence where "it is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated" (emphasis in original)).

*Id*.[21]

Thus, as the Court in *Dorvee* lamented with respect to §2G2.2, "sentencing enhancements cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases."  616 F.3d at 186.  Yet, as the Court cautioned, "[i]n all events, even a statutory maximum sentence must be analyzed using the §3553(a) factors."  616 F.3d at 184.

---

[21]  In *Dorvee*, the Court offered an example of how Guidelines like §2G2.2 create – via automatic substantial enhancements applied across a broad spectrum of a specific offense conduct – unwarranted *similarities* among dissimilar defendants: "[e]ven with no criminal history, this [defendant's] total offense level of 23 would result in a Guidelines sentence of 46 to 57 months.  This is the same Guidelines sentence as that for an individual with prior criminal convictions placing him in a criminal history category of II, who has been convicted of an aggravated assault with a firearm that resulted in bodily injury.[]"  616 F.3d at 187 (footnote omitted).  *See also* **post**, at 48-52.

47

Ultimately, the Court in *Dorvee* reminded that

> [d]istrict judges are encouraged to take seriously the broad
> discretion they possess in fashioning sentences under §2G2.2 – ones
> that can range from non-custodial sentences to the statutory
> maximum-bearing in mind that they are dealing with an eccentric
> Guideline of highly unusual provenance which, unless carefully
> applied, can easily generate unreasonable results.

616 F.3d at 188.

That "broad discretion" exists here as well, even when the specter of terrorism is present. As the Court concluded in *Dorvee*, "[w]hile we recognize that enforcing federal prohibitions on child pornography is of the utmost importance, it would be manifestly unjust to let Dorvee's sentence stand." *Id*. The same is true here with respect to applying §3A1.4 to Mr. Zea, notwithstanding the importance of counterterrorism policy and practice.

Here, as in *Dorvee*, "adherence to the Guidelines results in virtually no distinction between sentences for the most dangerous offenders," and someone like Mr. Zea who did not commit any violent acts and has not committed any offenses in the past. 616 F.3d at 187. Sentencing Mr. Zea within the Guidelines range would result in a sentence that is "fundamentally incompatible with § 3553(a)." *Id*.

**2.    *Increasing Mr. Zea's Criminal History Category From
Category I to Category VI Grossly Overstates His Criminal History***

Notwithstanding application of the enhancement in §3A1.4 to Mr. Zea, the Court should depart downward a significant amount, or impose a non-Guidelines sentence substantially below the Guidelines range, because the prong of the enhancement that assigns Mr. Zea to Criminal History Category VI, §3A1.4(b),  constitutes a gross overstatement of his criminal history, which otherwise would be Category I (lacking any prior criminal history, and therefore having zero

criminal history points).  Also, as discussed below, the enhancement undermines the structure of the Guidelines, and the role and purpose of the Criminal History Category in maintaining individualized sentencing determinations.

As a result, the Court should correct the inequity created by §3A1.4(b) with a substantial "horizontal" downward departure with respect to Mr. Zea's Criminal History Category.  As the Guidelines instruct, the Court may depart downward if:

> reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes[.]

USSG § 4A1.3(b)(1).

In addition, even without a formal departure on that ground, the distortion created by §3A1.4(b) provides further compelling justification for a non-Guidelines sentence, dramatically below the Guidelines range, based on the factors set forth in 18 U.S.C. §3553(a).

As one District Court has recognized, "[a]fter applying § 3A1.4, Defendant's criminal history is maximized at category VI.  For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside of the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history."  *United States v. Benkahla*, 501 F.Supp.2d 748, 759 (E.D.VA 2007) (granting a departure pursuant to USSG §4A1.3, and reducing the defendant's criminal history category from VI to I) (*affirmed*, 530 F.3d 300 (4th Cir. 2008).

Encouraging flexibility in addressing the impact of §3A1.4 on a defendant's Criminal History, the Second Circuit has instructed that "[a] judge determining that §3A1.4(b)

over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under §4A1.3 to depart downward in sentencing." *United States v. Meskini*, 319 F. 3d 88, 92 (2d Cir. 2003).

Moreover, as the Introductory Commentary to Chapter Four of the Sentencing Guidelines (entitled "Criminal History and Criminal Livelihood") states, "[t]he Comprehensive Crime Control Act sets forth four purposes of sentencing.   (*See* 18 U.S.C. § 3553(a)(2).)   *A defendant's record of past criminal conduct is directly relevant to those purposes*.   A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment."  (Emphasis added).

Here, the balance between the offense and the offender has been irremediably disrupted by the enhancement's reflexive placement of Mr. Zea in Criminal History Category VI.  In addition to ignoring the mandate of §3553(a)(1), and overstating Mr. Zea's Criminal History score as much as possible under the Guidelines (from zero to the maximum), the enhancement precludes any retention of individualized sentencing of Mr. Zea because it effectively removes from advisory Guidelines consideration the only axis that integrates a defendant's background and history into the advisory Guidelines equation.[22]

---

[22]  Justice Breyer, who chaired the Sentencing Commission, recounted the "trade-offs" that were part of the initial Sentencing Commission's compromises in formulating the Guidelines and their framework, including how the Criminal History Category was designed as the sole element that considered *offender* characteristics:

> [o]ne important area of such compromise concerns "offender" characteristics.  The Commission extensively debated which offender characteristics should make a difference in sentencing; that is, which characteristics were important enough to warrant formal reflection within the Guidelines and which should constitute possible grounds for departure.  Some argued in favor of

The only means of restoring any equilibrium to Mr. Zea's sentencing, and complying with the dictates of §3553(a)(1), is by departing downward based on Mr. Zea's lack of any prior criminal record, and/or imposing a non-Guidelines sentence, grounded in the other §3553(a) sentencing factors, well below Mr. Zea's statutory maximum sentence of 300 months' imprisonment.

Ordinarily, the exclusion of consideration of the defendant's background and history in the ordinary advisory Guidelines calculation is offset by the Criminal History score.  Here, though, it is respectfully submitted that the imbalance created by assigning Mr. Zea to Criminal History Category VI can be rectified only by a substantial "horizontal" downward departure.  *See, e.g.*, *United States v. Landa*, 281 F.Supp.2d 1139, 1141 (N.D.Cal. 2003) (downward departure granted upon a finding that the Criminal History Category had overstated the defendant's criminal

---

taking past arrest records into account as an aggravating factor, on the ground that they generally were accurate predictors of recidivism. [] Others argued that factors such as age, employment history, and family ties should be treated as mitigating factors. [] [e]ventually, in light of the arguments based in part on considerations of fairness and in part on the uncertainty as to how a sentencing judge would actually account for the aggravating and/or mitigating factors, the Commission decided to write its offender characteristics rules with an eye towards the Parole Commission's previous work in the area.[]  As a result, the current offender characteristics rules look primarily to past records of convictions. They examine the frequency, recency, and seriousness of past crimes, as well as age, treating youth as a mitigating factor. The rules do not take formal account of past arrest records or drug use, or the other offender characteristics which Congress suggested that the Commission should, but was not required to, consider.[] In a word, the offender characteristics rules reflect traditional compromise.

*See* Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1 (Fall 1988), at 19-20 (footnotes omitted).

history); *Czernicki v. United States*, 270 F.Supp.2d 391, 393 (S.D.N.Y. 2003) (downward departure granted upon a finding that the Criminal History Category had overstated the defendant's criminal history).

In the alternative, the automatic placement of Mr. Zea in Category VI should be remedied by a non-Guidelines sentence, well below the statutory maximum sentence, that accounts for the other §3553(a) factors that greatly outweigh the arbitrary application of the absolute and extreme horizontal Guidelines enhancement applied via §3A1.4(b). *See also* United States Sentencing Commission March 2006 *Final Report on the Impact of* United States v. Booker *on Federal Sentencing*, at 78 (excessive Criminal History Category constitutes one of the four most common reasons post-*Booker* for non-Guidelines sentences imposed below the calculated range).[23]

Accordingly, the effect of the terrorism enhancement, §3A1.4, should be neutralized, both vertically (regarding his offense level) and/or horizontally (regarding his Criminal History Category), through consideration of the §3553(a) factors consistent with the principles and concerns expressed in *Dorvee*.

In failing to present that advocacy, and instead proffering a futile and frivolous argument that wounded counsel's credibility at the outset of the sentencing proceeding, Mr. Zea's counsel failed to provide Mr. Zea the effective assistance of counsel to which Mr. Zea was entitled pursuant to the Sixth Amendment.

---

[23] The Sentencing Commission's 2006 Final Report is available at <https://docs.google.com/viewer?url=https%3A%2F%2Fwww.ussc.gov%2Fsites%2Fdefault%2Ffiles%2Fpdf%2Fnews%2Fcongressional-testimony-and-reports%2Fsubmissions%2F200603-booker%2FBooker_Report.pdf&pdf=true>.

**Conclusion**

Accordingly, for all the reasons set forth above, operating separately and/or in combination, it is respectfully submitted that Mr. Zea's petition pursuant to 28 U.S.C. §2255 be granted in its entirety, and his sentence vacated and a re-sentencing ordered.

Dated:  30 November 2017
        New York, New York

                                        Respectfully submitted,


                                        /S/ Joshua L. Dratel_____
                                        JOSHUA L. DRATEL
                                        JOSHUA L. DRATEL, P.C.
                                        29 Broadway, Suite 1412
                                        New York, New York 10006
                                        (212) 732-0707
                                        jdratel@joshuadratel.com

                                        *Attorneys for Petitioner*
                                        *Marcos Zea*


    – Of Counsel –

Joshua L. Dratel
Whitney G. Schlimbach
Lindsay A. Lewis